No. 99-050

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 59

STATE OF MONTANA,

Plaintiff and Respondent,

v.

DANNY CARL GOOD,

Defendant and Appellant.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and For the County of Missoula,
Honorable Ed McLean, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Margaret Borg and Leslie Ocks, Public Defenders Office,
Missoula, Montana

For Respondent:

Honorable Mike McGrath, Attorney General; Mark W. Mattioli,
Assistant Attorney General, Helena, Montana

Fred Van Valkenburg, County Attorney; Kirsten LaCroix, Deputy
County Attorney, Missoula, Montana

Submitted on Briefs:   April 5, 2001

Decided:  March 28, 2002

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    Danny Carl Good (Good) appeals from the Fourth Judicial District Court's denial of his motion to dismiss on speedy trial grounds and his conviction of sexual abuse of children.  We affirm in part, reverse in part and remand for a new trial.

¶2    The following issues are presented on appeal:

¶3    (1)  Was Good denied his right to speedy trial?

¶4    (2)  Is Good entitled to a new trial due to the District Court's denial of three of Good's challenges for cause during voir dire?

¶5    (3)  Did the District Court err when it allowed the prosecution to suggest on cross-examination that Good had committed acts of stalking, lying and assault?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6    On August 13, 1997, the State of Montana filed a complaint in Missoula County Justice Court charging Good with felony sexual abuse of children and three counts of felony sexual assault.  On September 24, 1997, an Information was filed in District Court charging the same four counts.  The District Court arraigned Good, and he entered a plea of not guilty on October 8, 1997.  Good was released on his own recognizance.

¶7    The court set the omnibus hearing for October 29, 1997.  On this date, the parties submitted an Omnibus Hearing Memorandum (omnibus memorandum) in which Good stated he intended to file a motion to suppress and seven other pretrial motions by December 15, 1997.  The State indicated it would respond to Good's motions by January 15, 1998.  The court vacated the omnibus hearing, approved the omnibus memorandum and stated the matter would be set for trial following the court's rulings on Good's pretrial motions.  It set a status conference for March 4, 1998.

¶8    On December 15, 1997, Good requested two additional weeks–or until December 30, 1997–to file his pretrial motions.  Regardless of this request, Good timely filed a document entitled "Defendant's Combined Motions & Brief" on December 15, 1997.  The attached certificate of service stated that the motions were hand-delivered to the Missoula County Attorney's Office on this date.   Included were five motions in limine and a request for a list of the State's witnesses.  However, Good did not file a motion

to suppress or any of the other pretrial motions he indicated he would file in the omnibus memorandum.

¶9    At the March 4, 1998, status conference, the court was advised that Good had filed his motions on December 15, 1997, but that the State had not located the motions in their file.  The court granted the State's request for ten additional days to respond to Good's motions in limine and set a second status conference for April 8, 1998.  On this date, the State responded to Good's motions, Good moved for a trial setting, and the court set the matter for trial on June 23, 1998.

¶10    On June 17, 1998, the court granted the State's unopposed motion to continue the trial until June 30, 1998.  Subsequently, due to the District Court judge's impending surgery, the court continued the trial until August 10, 1998, on its own unopposed motion.

¶11    Good filed a motion to dismiss on speedy trial grounds on August 3, 1998.  Good's motion was heard, opposed and denied immediately prior to the commencement of trial on August 10, 1998.

¶12    At the outset of Good's trial, his counsel conducted voir dire of the jury panel.  When Good's counsel discussed the presumption of innocence, a prospective juror, Laurie Gregory, expressed that she would have difficulty believing that the teenage victim would make up a story about sexual abuse.  Based on this response, Good challenged her for cause.  The State and the District Court attempted to rehabilitate Gregory, yet Gregory persisted in her initial  response.  At this point, the District Court gave a lengthy "civics speech" regarding the presumption of innocence.  When finished, the District Court asked Gregory if she "quarreled" with his speech, and she responded, "no."  The District Court then denied Good's challenge for cause.   In addition, the District Court denied Good's challenge for cause directed at prospective juror Ann Acheson after she expressed that she felt similar to Gregory.   Good removed Gregory and Acheson with two of his six peremptory challenges, and he exhausted all four of his other challenges on other prospective jurors.

¶13    When discussing a defendant's Fifth Amendment right to remain silent during voir dire, Good's counsel also challenged for cause a prospective juror, whose name is unknown,  when she stated that she would find it hard to understand why a defendant would not want to testify in his own defense and it would bias her opinion.  After the District Court attempted to explain the right to remain silent and asked the juror if she could follow the law, the juror replied, "uh-huh."  The District Court then denied Good's challenge for cause.

¶14    During the trial, Good called two witnesses who essentially testified that Good acted appropriately with young girls, that he was extremely professional at work, and that he was prudish and never made sexually inappropriate statements.  During the State's cross-examination of one witness, it asked whether his opinion would change if he knew that Good had stalked his daughter, lied to a process server and engaged in assaultive behavior to a group of young girls.  The State questioned the other witness as to whether her opinion of Good would change if she knew he had stalked his daughter.

¶15    Following the trial, the jury found Good guilty of sexual abuse of children.  However, the court declared a mistrial on the three sexual assault counts because the jury could not reach a verdict on these counts.

¶16 After his conviction, Good's case was before this Court on appeal, and we ordered the speedy trial issue remanded to the District Court for reconsideration in light of City of Billings v. Bruce, 1998 MT 186, 290 Mont. 148, 965 P.2d 866. After briefing, evidentiary hearings and oral arguments, the District Court held that Good's constitutional right to a speedy trial was not violated by the 362 days of delay in this case.

¶17 Good now appeals the second denial of his motion to dismiss on speedy trial grounds, the court's denial of his challenges for cause during voir dire and the court's handling of the State's cross-examination of two of Good's witnesses.

## DISCUSSION

¶18 (1) Was Good denied his right to speedy trial?

¶19 Good contends that the District Court incorrectly concluded that he was not denied a speedy trial. Whether a defendant has been denied a speedy trial is a question of constitutional law. We review a district court's conclusions of law to determine whether its interpretation of the law is correct. State v. Highpine, 2000 MT 368, ¶ 13, 303 Mont. 422, ¶13, 15 P.3d 938, ¶ 13 (citation omitted).

¶20 Both the Sixth Amendment to the United States Constitution and Article II, Section 24, of the Montana Constitution, guarantee a criminal defendant's right to a speedy trial. Highpine, ¶ 14. In reviewing a claim that a defendant has been denied a speedy trial, we consider and balance each of the following four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant. Barker v. Wingo (1972), 407 U.S. 514, 530-33, 92 S.Ct. 2182, 2192-93, 33 L.Ed.2d 101, 117-18, as applied in Bruce, ¶ 19. Since no single factor is decisive, courts must engage in a difficult and sensitive balancing process. Barker, 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.

### Length of Delay

¶21 We first consider the length of delay from the time charges were filed until Good's trial date. When the delay is 200 days or longer, further speedy trial analysis is necessary. Bruce, ¶ 55. In this case, the parties agreed that there were 362 days of delay and, as a result, the court engaged in further speedy trial analysis.

### Reason for Delay

¶22 We next consider the reason for the delay and attribute the delay to the parties. If the court attributes 275 days or more to the State, the State bears the burden to establish that the defendant has not been prejudiced by the delay. Bruce, ¶ 56. If the State satisfies its burden and shows that the defendant was not prejudiced by the delay, the burden then shifts to the defendant to demonstrate prejudice. State v. Hardaway, 1998 MT 224, ¶ 23, 290 Mont. 516, ¶ 23, 966 P.2d 125, ¶ 23. "[T]he [State] bears the burden of prosecution, and a defendant is under no obligation to ensure diligent prosecution of the case against him or to help the [State] avoid dismissal for failure to timely prosecute him." State v. Kipp,

1999 MT 197, ¶10, 295 Mont. 399, ¶10, 984 P.2d 733, ¶10 (quoting Bruce, ¶ 63). Delay caused directly by the State as well as delay which is institutional in nature is attributable to the State, although institutional delay is accorded less weight. Highpine, ¶ 16.

¶23 Of the 362 days of delay, the District Court attributed 236 days of delay to the State and 126 days to Good. The court held Good responsible for the delay between the time he stated he would file a motion to suppress on October 29, 1997, and the status conference on March 4, 1998. The court concluded that Good's failure to file the motion to suppress resulted in the court waiting to set a trial date. At the Bruce hearing, the court declared that in the future it would change its policy regarding pretrial motions. It stated it would require attorneys to notify the court if they do not intend to file pretrial motions and, when the motions come to the court's attention for status review, the court will deem them untimely and permanently withdrawn.

¶24 Good contends that the court incorrectly attributed 126 days of delay to him for his failure to file a motion to suppress. Good claims that the court knew that he timely filed his Combined Motions & Brief on December 15, 1997, the date specified in the omnibus memorandum. He insists that any delay resulting from the filing of his motions was due to the State's failure to locate his motions and its resulting failure to learn that Good had effectively withdrawn his intention to file a motion to suppress.

¶25 The State claims that the court appropriately attributed the 126 days of delay to Good. The State argues Good's decision to give notice of various pretrial motions, particularly a motion to suppress, "placed his case in a separate category for purposes of the district court's management of its criminal caseload. Because the rules of criminal procedure expressly require resolution of motions to suppress prior to trial, it was appropriate for the district court to refrain from setting a trial date. . . . [Good] influenced, and acquiesced in, these matters." Furthermore, the State argues it never received Good's motions until the March 4, 1998, status conference. Finally, the State urges the Court to, at the least, attribute to Good the delay between October 29, 1997, when Good gave notice he would file motions, through the December 30, 1997, extension date, plus an additional 30 days, presumably for a State response.

¶26 We hold that the District Court erred in attributing the 126 days of delay from October 29, 1997, until March 4, 1998, to Good. Rather, this delay is directly attributable to the State due to its failure to locate Good's motions. Pursuant to the State's duty to diligently prosecute, it should have discovered that Good's motions were timely filed as well as the nature of Good's motions well before the March 4, 1998, status hearing. Additionally, despite the State's assertions, Good cannot be held responsible for the court's policy regarding the setting of trial dates and its management of its criminal caseload. Rather, this is institutional delay. It appears the court recognized as much when declaring a new policy with regard to the filing of pretrial motions. In sum, the 362 days of delay in this case are attributable to the State.

Assertion of Right

¶27 A defendant properly asserts his right to a speedy trial if he invokes the right at any time prior to the commencement of trial. Bruce, ¶ 57. Here, Good properly asserted his speedy trial right on August

3, 1998, or seven days before trial.

## Prejudice

¶28    Finally, we consider whether Good was prejudiced by the delay in this case.  Although the District Court erred in holding that the State did not bear the burden of demonstrating lack of prejudice to Good, we conclude that this error was harmless since the State satisfied this burden during its cross-examination of Good during the evidentiary hearing on this issue.  Additionally, Good presented evidence in an effort to demonstrate that he was prejudiced by the delay.  After considering the testimony elicited by both parties, the District Court weighed all the evidence before concluding that Good, for speedy trial purposes, suffered no prejudice as a result of the delay.

¶29    In demonstrating lack of prejudice, the State should offer proof on as many of the following bases as possible: (a) pretrial incarceration; (b) anxiety and all of its attendant considerations; and (c) impairment of the defense.  Highpine, ¶ 22.  The State must, at a minimum, present proof that the delay did not impair the defense.  Highpine, ¶ 22.  Impairment of defense is arguably the most important of the three factors to consider because a defendant's inability to adequately prepare his case undermines the fairness of the entire trial system.  State v. Price, 2001 MT 212, ¶ 28, 306 Mont. 381, ¶ 28, 34 P.3d 112, ¶ 28 (citations omitted).  In determining whether the State met its burden, we address each prejudice factor.

¶30    Here, Good conceded that he was not incarcerated and thus suffered no prejudice due to pretrial incarceration.  Most importantly, Good also conceded that the delay did not impair his defense.

¶31    Consequently, the District Court properly focused its considerations on whether Good was prejudiced due to pretrial anxiety.  At the outset, we acknowledge that a certain amount of anxiety and concern is inherent in being charged with an offense, and we focus on whether it is aggravated due to delay.  Highpine, ¶ 28.

¶32    Good claims that the delay in this case caused his family and him anxiety and concern.  Citing Kipp, Good insists that since the State offered no evidence rebutting Good's showing of prejudice due to anxiety and concern, the court should have concluded Good's anxiety and concern were real and, thus, Good was prejudiced.

¶33    However, the State points to Good's own testimony to show that his problems were attributable to the nature of the crimes he faced rather than pretrial delay.  The District Court agreed and held that while Good and his family suffered financial and emotional stress, the testimony reflected that they did not experience trauma exceeding the level of anxiety and concern inherent in being charged with a felony sexual crime against a child family member.

¶34    At the hearing, Good testified that he quit his job approximately four months after charges were filed, but he obtained other employment while his case was pending.  Good testified that he talked with a counselor friend and was prescribed anti-depressant medication shortly after he was charged and continued to seek counseling and take medication after the trial.  Good claimed that stress caused him to lose forty pounds prior to trial and required removal of his gallbladder after trial.  Good also claimed that

his neighbors "alienated themselves" from him and that his mother would not talk to him because he could not repay money she loaned him for legal fees. Good testified that his problems with the Department of Public Health and Human Services' involvement with his daughter began when he was charged and continued at the time of the Bruce hearing.

¶35    As the above testimony demonstrates, Good's problems began when he was charged and persisted after his trial and during his appeal. Under such circumstances, we cannot say that the District Court erred in holding that the source of Good's pretrial anxiety and concern stemmed from the nature of the charges he faced rather than the delay.

¶36    Given that Good conceded he suffered no pretrial incarceration and, most importantly, that he conceded his defense was not impaired by the delay, and having concluded that Good's pretrial anxiety and concern was not aggravated due to the delay, we hold that Good was not prejudiced as a result of the delay in this case.

Balancing Speedy Trial Factors

¶37    As discussed in Bruce, our analysis of speedy trial claims features both a "straight balancing test" and a "motive test." Bruce, ¶ 54. As such, the importance of the prejudice factor and the degree of prejudice necessary to establish denial of speedy trial will vary based upon other considerations, such as the length of the delay and the reason for the delay. State v. Keyes, 2000 MT 337, ¶ 17, 303 Mont. 147, ¶ 17, 15 P.3d 443, ¶ 17. The greater the degree of fault by the State in causing the delay, the less the delay or prejudice that need be shown. However, if the State is not responsible for delay, greater prejudice, and presumably greater delay, would have to be shown. Bruce, ¶¶ 53, 58. Here, because the State is both directly and indirectly responsible for all of the delay in this case, less prejudice must be demonstrated.

¶38    We conclude that (1) the length of the delay triggered further speedy trial analysis; (2) Good asserted his right to a speedy trial; (3) the State bore the burden of showing no prejudice; (4) the delay weighs against the State; and (5) the State proved lack of prejudice. After balancing these factors, we hold that the District Court did not err in holding that Good was not denied a speedy trial.

¶39    (2)  Is Good entitled to a new trial due to the District Court's denial of three of Good's challenges for cause during voir dire?

¶40    We will not reverse a district court's decision regarding a juror's fitness to serve absent an abuse of discretion.   State v. DeVore, 1998 MT 340, ¶ 12, 292 Mont. 325, ¶ 12, 972 P.2d 816, ¶ 12;  State v. Williams (1993), 262 Mont. 530, 536, 866 P.2d 1099, 1102.

¶41    Our analysis of cases involving a juror's fitness to serve involves a two-step process. First, we must determine whether the District Court abused its discretion when it denied Good's challenges for cause. Second, if we determine that the District Court abused its discretion, we must determine whether Good's conviction should be set aside as a result of the error. See DeVore, ¶ 13.

¶42     In a non-capital case, a defendant is entitled to six peremptory challenges in addition to

challenges for cause. Sections 46-16-115 and -116, MCA. Section 46-16-115, MCA, sets forth the reasons a juror may be excused for cause. In pertinent part it states that a district court should excuse a juror for cause when he or she has a "state of mind in reference to the case or to either of the parties that would prevent the juror from acting with entire impartiality and without prejudice to the substantial rights of either party." Section 46-16-115(2)(j), MCA. When jurors who should have been removed for cause are not removed and must, therefore, be removed by peremptory challenge, the party wrongfully denied the challenge for cause effectively loses one of the peremptory challenges to which he is entitled by law. Williams, 262 Mont. at 537, 966 P.2d at 1103.

¶43 At issue here is the state of mind of jurors Gregory, Acheson, and an unknown juror. We decline to address whether the District Court abused its discretion with regard to the unknown juror since Good cannot conclusively demonstrate that he exercised one of his peremptory challenges to remove her. Consequently, with regard to this juror, Good cannot satisfy the second prong of the Williams test discussed below.

¶44 We thus focus our attention on Good's challenges for cause to prospective jurors Gregory and Acheson. After addressing the nature of the charges Good faced and the concept of the presumption of innocence, Good's counsel posed the following question to all of the prospective jurors:
Who of you would have difficulty continuing to presume my client innocent as you listen to a sixteen-year-old young lady saying that [Good] committed these acts?

¶45 Juror Gregory responded to the question:

> GREGORY: I teach school, and I'm around kids all the time. It is partly my job as a school teacher to be on the lookout for any type of abuse, whether it is sexual or physical, but I guess in my mind I just don't think a girl would make this stuff up. I mean, I would have to really hear some compelling evidence to say that she had it in her makeup to lie like that–that strong of a lie.

¶46 Good's counsel moved that she be excused for cause based on her answer. The prosecuting attorney then attempted to rehabilitate Gregory:

> [PROSECUTOR]: The trial process is kind of a strange and surreal process where we require you–or the law requires you simply to maintain an open mind until you go into deliberate.
>
> I believe the original question was: After hearing the complaining witness testify in this case, could you reserve from forming an opinion until after all the evidence was in and after the trial was completed and you were in the jury room deliberating?
>
> GREGORY: It is hard for me to answer that because I have never been in the situation, so in all honesty, I think it would be hard to do that. I'm a mother of two teenage girls.

[PROSECUTOR]: Would you be able to base your opinion on the evidence and testimony that was presented in Court and your own common sense and experiences–but on what was presented to you. Could you weigh and gather that information?

GREGORY:   I would try.

¶47    At this point the District Court intervened:

[COURT]: Well, let me interrupt here. I'm listening to your answer to some of these questions, and it sounds as though because an allegation is made, that you made up your mind that Mr. Good is guilty. Are you telling us that?

GREGORY: No, I haven't made up my mind, but I would have a hard time thinking that that girl would make this all up. I'm not saying I think he is guilty, but on the other hand, I also wonder in these kind of cases what would provoke a sixteen-year-old to put herself through this–like you were saying to come to court and testify in front of all of us.

¶48    In response, the Court engaged in a short discussion of the presumption of innocence in which he stated that the "presumption remains with Mr. Good throughout every stage of these proceedings until you go into the jury room." He went on to explain that all of the jurors must "agree that he assaulted her at one specific time and incident," and that "the law is very specific in that regard, and the reason it is specific is for the presumption of innocence." The Court then stated:

[COURT]: Now, I appreciate your difficulty and the difficulty of being a mother, and I think the fathers have the same protective instincts, but still our duty is to make certain that the State proves every allegation, and we do that by keeping an open mind until we go in to deliberate.

And if I'm hearing your answers correctly, you seem predisposed to a conviction; is that correct?

GREGORY:  I guess I'm not sure.

[COURT]: Well, you know it is natural–it is natural to wonder why someone would make such an allegation against someone, just like why would law enforcement investigate a case and charge if they didn't believe it. But, what we do as a potential juror is we promise that the Information is but a way of informing the Defendant, the jury, and the public of the allegations that are lodged against the Defendant.

But, unlike other countries, there is a specific burden on the State here, and that is that we have to go and prove each and every allegation despite all their previous investigations, and that is why we have the jury system as the buffer and why we have, in

cases like this, a jury trial instead of trials before the bench, to break us away from the familiarity that we all might have in government working with each other.

Here we say you're going to come through our citizens to get a conviction of such serious allegations, and that is an important role, and jurors have probably the most important role in the judicial system, as far as I'm concerned, and it only works if we have jurors sit there with skepticism until they are convinced beyond a reasonable doubt.

Do you quarrel with my little civics speech?

GREGORY:    Do I?

[COURT]:    Yes.

GREGORY:    No.

[COURT]:  I don't care what they allege, they better prove each and every one of these.  Do you think you could be of that frame of mind?

GREGORY:    Yes.

[COURT]:  Thank you.  I will not excuse this juror for cause.

¶49    Good's counsel then asked who else raised their hands when he asked who would have difficulty continuing to presume Good innocent as they listened to the victim testify.  Juror Acheson raised her hand:

[DEF. COUNSEL]: You heard all the exchanges that we just had and you heard the speech by the Court.  How do you feel?  Do you feel that you could remain–that you could believe in the presumption of innocence, that my client is innocent, and sit with an open mind throughout the trial?

ACHESON: I guess I feel similar to what has already been said, and I would try.  I guess what I worry about is if I have to err on one side or the other, I'm not sure which way to go.  What do I do?

[COURT]: Well, if you're going to err, you err on the side of the Defendant.  Them's the rules.

. . . .

[DEF COUNSEL]: I just want to make sure that I understand what is inside your mind– and this is also an emotional topic, so what is inside your heart and wherever you harbor your emotions–I presume it is the heart.

Do you feel comfortable that you would do as the Constitution requires, that you will do as the Judge instructs, that you can sit calmly and listen to the witness, who is going to be a teenage young lady, make these accusations, and you can remain in that frame of mind that you're not going to make up your mind at that point?

ACHESON:   Yes.

[DEF. COUNSEL]: You don't say that with a lot of conviction, it seems to me.  Am I correct?

ACHESON: Yes, to be honest it will be a very emotional issue for me.  It will be difficult.  So what I will have to do is keep telling myself, don't make up your mind until this is all over.

¶50    After Acheson's final response, Good challenged her for cause, and the Court  denied Good's challenge

¶51    Good contends that the District Court abused its discretion by denying his challenges for cause. He claims Gregory and Acheson expressed reservations about their ability to give the benefit of any doubt to the Defendant in light of their predisposition to favor the testimony of a teenage complaining witness under these circumstances.  Good insists that the District Court's attempts to rehabilitate these jurors "eventually evoked the positive response the Court was seeking, but their responses did not demonstrate a definitive change in their states of minds."  Citing DeVore, Good also contends that it is doubtful that many, if any, prospective jurors are going to "quarrel" with a judge's "little civics speech."   Finally, Good states that he was wrongfully denied two of his six peremptory challenges because he had to use them to remove Gregory and Acheson.

¶52    The State, on the other hand, urges the Court to review the District Court's colloquy deferentially. Also, the State claims Good's reliance on DeVore is misplaced.  It states that unlike this case, the DeVore panelists' initial statement that "the defendant must be guilty of something" indicated that they prejudged the defendant's guilt.  According to the State, Gregory and Acheson did not prejudge Good's guilt but rather had understandable concerns regarding evidence-weighing.  In such a circumstance, the State claims the court properly stepped in to explain the state of the law.  Moreover, the State argues that Good acquiesced in the trial court's active participation in voir dire when he failed to object.

¶53    We hold that the District Court abused its discretion when denying Good's challenges for cause to jurors Gregory and Acheson.  Here, as in DeVore, Gregory and Acheson did not express an unequivocal opinion that Good was guilty as charged. Yet, they did express a form of bias based on their belief that a young sexual abuse victim would not lie.  Gregory persisted in this opinion when faced with the prosecutor's and court's repeated attempts to explain the presumption of innocence, and she did not relent until asked whether she "quarreled" with the District Court's "civics speech."  In Acheson's case, she honestly stated that it was an emotional and difficult issue for her, and she would have to "keep telling herself" not to make up her mind even after the court's attempt at rehabilitation.  As in DeVore,

although Gregory and Acheson may not have stated in so many words that they believed Good was guilty of something, their adherence to the belief that a sexual abuse victim would not lie clearly demonstrated a serious question about their ability to act with impartiality and to afford Good the presumption of innocence to which he was entitled. Accordingly, the District Court should have excused these jurors for cause under § 46-16-115(2)(j), MCA.

¶54    Furthermore, we have repeatedly admonished trial judges to refrain from attempting to rehabilitate jurors by putting them in a position where they will not disagree with the court. State v. Brown, 1999 MT 339, ¶ 27, 297 Mont. 427, ¶ 27, 993 P.2d 672, ¶ 27 (Nelson, J., specially concurring) (when a juror "is sitting in an unfamiliar and imposing courtroom surrounded by her peers, attorneys, possibly other members of the community, and the trial judge, it strains credulity to believe that a prospective juror is going to persevere in her personal concerns about her ability to fairly hear the case . . ."); DeVore, ¶ 28; Williams, 262 Mont. at 536, 866 P.2d at 1103. As we stated in Williams and repeated in DeVore, "[f]ew people would show the kind of contempt for a judicial officer that would have been necessary to persist in her admissions of bias under those circumstances. . . . It is not a district court's role to rehabilitate jurors whose spontaneous, and thus most reliable and honest, responses on voir dire expose a serious question about their ability to be fair and impartial." DeVore, ¶ 28.

¶55    Here, we find ourselves faced with the same problem we identified in Brown, Williams, and DeVore. The District Court abused its discretion when it chose to ignore prospective jurors' spontaneous and honest statements indicating they could not be impartial in favor of its own attempt to rehabilitate the jurors. While we review a trial court's decision regarding a juror's fitness to serve deferentially, we cannot turn a blind eye to human nature and the fact that the jurors' deference to the trial judge's civics speech may well be at the expense of juror impartiality.

¶56    Although the State contends that Good was required to not only challenge the jurors for cause but also object to the court's rehabilitation attempts, it cites no legal authority for this proposition. We find no merit to the argument. We hold that the District Court abused its discretion when denying Good's challenges for cause to prospective jurors Gregory and Acheson.

¶57    The second part of our analysis in this case involves the effect of our holding that the District Court abused its discretion when denying Good's challenges.

¶58    In Williams, this Court held that it will presume prejudice if: (1) a district court abuses its discretion by denying a challenge for cause to a prospective juror; (2) the defendant uses one of his or her peremptory challenges to remove the disputed juror; and (3) the defendant exhausts all of his or her peremptory challenges. In addition, we held that if the presumption of prejudice is established, this Court will balance the presumption "against the totality of the circumstances in each case to determine whether the error contributed to the defendant's conviction." Williams, 262 Mont. at 538, 866 P.2d at 1103. We arrived at this conclusion based on the "overwhelming evidence rule" as set forth in Brodniak v. State (1989), 239 Mont. 110, 779 P.2d 71. Williams, 262 Mont. at 537-38, 866 P.2d at 1103-04. Subsequently, in DeVore, we refined this balancing test and held that a defendant on appeal need not show actual prejudice but, rather, "he need only establish that the jury was charged with the determination of a factual issue important to the charges against him." DeVore, ¶ 41. In both Williams

and DeVore, we declined to adopt the rule that an abuse of discretion in denial of a challenge to a juror for cause is conclusively prejudicial and requires automatic reversal. Williams, 262 Mont. at 537-38, 866 P.2d at 1103-04; DeVore, ¶¶ 40-41.

¶59   In State v. Van Kirk, 2001 MT 184, 306 Mont. 215, 32 P.3d 735, we recently rejected the "overwhelming evidence rule" upon which Williams and DeVore rely. In Van Kirk, we adopted a two-step analysis to determine whether an error prejudiced a criminal defendant's right to a fair trial and is therefore reversible. Van Kirk, ¶ 37. The first step is to determine whether the error is a structural error or a trial error. Van Kirk, ¶ 37. A structural error is typically of constitutional dimensions, precedes the trial, and undermines the fairness of the entire trial proceeding. It cannot be qualitatively or quantitatively weighed against the admissible evidence introduced at trial. As such, structural error is presumptively prejudicial and is not subject to harmless error review jurisprudentially or under our harmless error statute found at § 46-20-701(1), MCA. Van Kirk, ¶ 38. In other words, structural error is automatically reversible and requires no additional analysis or review. Van Kirk, ¶ 39.

¶ 60   For instance, structural error exists when there is a material failure to substantially comply with statutes governing the procurement of a trial jury, State v. LaMere, 2000 MT 45, ¶ 50, 298 Mont. 358, ¶ 50, 2 P.3d 204, ¶ 50, and if a defendant is excluded from in-chambers individual voir dire proceedings, State v. Bird, 2002 MT 2, ¶¶ 39-40, 308 Mont. 75, ¶¶ 39-40, __ P.3d __, ¶¶ 39-40. We have stated that jury selection is critically important in assuring an accused's fundamental right to an impartial jury and a fair trial. Bird, ¶ 48 (citing LaMere, ¶ 50). Errors involving jury selection "indelibly affect the fairness of the trial" since the errors precede the trial. Bird, ¶ 39 (quoting LaMere, ¶¶ 39-50).

¶61   Trial error, on the other hand, typically occurs during the presentation of the case to the jury and is subject to review under the harmless error statute, § 46-20-701(1), MCA. Trial error is not presumptively prejudicial or automatically reversible. Van Kirk, ¶ 40.

¶62   Upon reviewing Van Kirk and LaMere, we now hold that structural error occurs if: (1) a district court abuses its discretion by denying a challenge for cause to a prospective juror; (2) the defendant uses one of his or her peremptory challenges to remove the disputed juror; and (3) the defendant exhausts all of his or her peremptory challenges. As in LaMere and Bird, such error precedes the presentation of evidence and affects the very framework in which the trial proceeds. Additionally, the impartiality of the jury is at issue when a defendant is effectively denied peremptory challenges. Furthermore, unlike trial error, an error during voir dire does not involve the admission of tainted evidence which can be qualitatively or quantitatively weighed against the admissible evidence introduced at trial.

¶63   If the three-part Williams test is met, the error is structural and requires an automatic reversal. Accordingly, to the extent that Williams and DeVore require a defendant to establish that the district court error contributed to the defendant's conviction by showing that the jury was charged with the determination of a factual issue important to the charges against him, they are hereby expressly overruled. We leave intact, however, the remainder of the Williams three-part test set forth above for determining whether a district court's denial of a challenge for cause to a prospective juror is structural error and thus automatically reversible.

¶64    The dissent maintains that we should stay with the Williams/DeVore rationale that the role of the jury is to resolve disputed issues of fact and that prejudice to a party from an erroneous denial of a challenge for cause can occur only if a question of fact exists.  The dissent thus maintains that, in a criminal prosecution in which the State's evidence is uncontroverted, there are no disputed facts and thus no potential for prejudice arising from an erroneous denial of a challenge for cause.  As the dissent notes, in DeVore we held that, although a defendant did not need to show actual prejudice from the denial of a challenge for cause, he did need to establish that the jury was charged with the determination of a factual issue important to the charges against him.

¶65    The fallacy in the Williams/DeVore reliance on "disputed facts," is that it fails to recognize that in a criminal case, the accused is not obligated to put on any evidence or to disprove the State's case–rather, innocence is presumed.  Thus, even if the State's case is uncontroverted, the matter is still presented to the jury and the jury has the prerogative of rejecting the State's case for any number of reasons including that the jurors find the State's witnesses not credible, its evidence improbable, or its proof insufficient.  Accordingly, it can never truly be said that the jury in a criminal case is not "fact finding."  Even assuming arguendo that there is some legitimate dispute as to whether the role of the jury in an uncontroverted case is properly characterized as "fact finding," there is no question but that the jury is engaged in decision making when it determines the guilt or innocence of the accused. The accused has a fundamental right to have that most basic of all decisions (guilt or innocence) made by an impartial jury.  Irvin v. Dowd (1961), 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755.  As we recognized in Williams, when jurors who should have been removed for cause are not removed, they must be removed by peremptory challenge, thereby effectively reducing that party's number of peremptory challenges.  When the State has more peremptory challenges than the accused, the State has an unmistakable tactical advantage and the impartiality of the jury is compromised. Errors which affect the impartiality of the jury are, by definition, structural and require reversal.

¶66    Here, the three-part Williams test is satisfied.  The District Court abused its discretion by denying challenges for cause to Gregory and Acheson.  Good used two of his six peremptory challenges to remove these jurors who should have been removed for cause, and he exhausted all of his peremptory challenges.  Accordingly, we hold that the District Court's denial of Good's challenges for cause to Gregory and Acheson was structural error and requires automatic reversal.  We reverse and remand for a new trial.

¶67    (3)  Did the District Court err when it allowed the prosecution to suggest on cross-examination that Good had committed acts of stalking, lying and assault?

¶68    Since we hold that Good is entitled to a new trial due to voir dire errors, we decline to address this issue.

¶69    Affirmed in part, reversed in part and remanded for a new trial.

/S/ W. WILLIAM
LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM REGNIER

Justice Patricia O. Cotter specially concurs.

¶70    I concur in the majority's conclusion that a district court's abuse of discretion in failing to grant a challenge for cause during voir dire in a criminal case must be considered a structural error that is conclusively prejudicial.  In light of the necessity for a unanimous verdict in a criminal case, one prospective juror lost to the defendant due to an erroneous denial of a challenge for cause could clearly mean the difference between conviction and either acquittal or a hung jury.

¶71    Obviously Van Kirk, Williams, and DeVore are criminal cases.  As the majority notes in ¶59, we adopted the structural error/trial error analysis in Van Kirk to determine whether an error prejudiced a criminal defendant's right to a fair trial (emphasis added).  However, because the majority here does not insert the "in a criminal case" limitation in its conclusion that an abuse of discretion in failing to grant a challenge for cause during voir dire is structural error and therefore automatically reversible, I write separately to state that I would limit the Court's holding in this regard to criminal cases only, and would apply a different test in civil cases.

/S/ PATRICIA
COTTER

Justice Terry N. Trieweiler concurring and dissenting.

¶72    I concur with the majority's conclusions that Danny Carl Good was not denied his right to speedy trial and that he is entitled to a new trial based on the District Court's erroneous refusal to grant challenges to jurors for cause.

¶73    I dissent from the majority's conclusion that the District Court's abuse of discretion during the jury selection process is "structural" error which will always require reversal without regard to the narrow exception we established in State v. DeVore, 1998 MT 340,  292 Mont. 325, 972 P.2d 816.  I believe this case is a clear example that the bright line dichotomy between "structural" and "trial" errors for purposes of analyzing whether error was harmless will ultimately lead to arbitrary results which bear no relationship to the actual impact of an error on the outcome of a case and will undermine public confidence in the criminal justice system.  In retrospect, I conclude that this Court erred when it adopted the "structural"/"trial" dichotomy for analyzing error which was first formulated by the U.S. Supreme Court in Arizona v. Fulminante (1991), 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302, and which has

proven problematic in its application by federal courts, including the U.S. Supreme Court.

¶74    It seems ironic to me that by expanding structural error to include abuses of discretion by the District Court during the jury selection process, we have expanded the circumstances under which trial court error will lead to automatic reversal when, in fact, the U.S. Supreme Court's intention in Fulminante was to actually narrow the circumstances which will lead to automatic reversal.

¶75    In Fulminante, the issue was whether the defendant's confession had been coerced and, if so, whether the harmless error rule could be applied to save a conviction even though the coerced confession had been admitted during the defendant's trial.  The court held that the confession had been coerced and a majority of the court held that its admission had been prejudicial to the defendant.  However, a five-person majority of the Supreme Court in an opinion authored by the chief justice held that admission of a coerced confession need not always lead to automatic reversal.  In doing so, the Court reversed its previous line of authority including Chapman v. California (1967), 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705, which included coerced confessions among those types of error which could never be characterized as harmless.  The majority rationalized their decision by distinguishing those types of error which occur during trial and can be "quantitatively assessed in the context of other evidence," Fulminante, 499 U.S. at 308, and error which it considered "structural" such as the deprivation of right to counsel, which are "defects in the constitution of the trial mechanism, and defy analysis by "harmless error" standards."  Fulminante,  499 U.S. at 309.  However, the arbitrariness and difficulty with application of the majority's dichotomy was immediately apparent to a four-person minority.  In a dissent to that part of the opinion written by Justice White, after noting the majority's attempt to distinguish "trial errors" from "structural defects," the dissenting members of the court noted:

> This effort fails, for our jurisprudence on harmless error has not classified so neatly the errors at issue.  For example, we have held susceptible to harmless-error analysis the failure to instruct the jury on the presumption of innocence, Kentucky v. Whorton, 441 U. S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979), while finding it impossible to analyze in terms of harmless error the failure to instruct a jury on the reasonable doubt standard, Jackson v. Virginia, 443 U.S. 307, 320, n. 14, 99 S.Ct. 2781, 2790 n. 14, 61 L.Ed.2d 560 (1979).  These cases cannot be reconciled by labeling the former "trial error" and the latter not, for both concern the exact same stage in the trial proceedings.  Rather, these cases can be reconciled only by considering the nature of the right at issue and the effect of an error upon the trial.

Fulminante, 499 U.S. at 291.

¶76    The minority noted the most immediate problem with the majority's analysis when it pointed out that "a defendant's confession is 'probably the most probative and damaging evidence that can be admitted against him,'" Fulminante, 499 U.S. at 292 (citations omitted).  The inconsistency of concluding that the admission of coerced confessions can be harmless because occurring during the trial phase of the proceedings whereas denial of a peremptory challenge is arguably "structural" was also pointed out by dissenting Judge Leavy in United States v. Annigoni (9th Cir. 1996), 96 F.3d 1132, when

he wrote as follows:

> [I]n the last ten years the Supreme Court has established that even errors which violate important constitutional rights are subject to harmless error analysis.
>
> . . .
>
> We have gone from that holding [referring to Rice v. Wood, 77 F.3d 1138 (9th Cir. 1996)] to the majority's holding that the denial of a defendant's statutory right to exercise a peremptory challenge, which he has an unfettered right to exercise even for reasons of superstition, now calls for automatic reversal. John Quincy Adams said it best: "I told him that I thought it was law logic-- an artificial system of reasoning, exclusively used in courts of justice, but good for nothing anywhere else." [Quoting John Quincy Adams, Memoirs of John Quincy Adams 4:372 (Charles Francis Adams ed. 1875)].

Annigoni, 96 F.3d at 1149-50.

¶77　Nor has the Fulminante dichotomy for analyzing error escaped criticism from those who have studied its consequences. In State v. LaMere, 2000 MT 45, 298 Mont. 358, 2 P.3d 204, we quote several times from David McCord, The "Trial"/"Structural" Error Dichotomy: Erroneous, and Not Harmless, 45 U.Kan.L.Rev. 1401, 1412 (1997), for an explanation of what the Supreme Court intended by the Fulminante decision. However, it is also helpful to consider the same author's observations of the consequences of the Fulminante decision. McCord states by way of introduction that:

> [T]his erroneous rule of law is not harmless because it adds an unneeded layer of complexity to harmless error law and distracts courts from the true task at hand: determining whether constitutional errors are serious enough to mandate reversal.

McCord, The Trial Structural Error Dichotomy, 45 U.Kan.L.Rev. at 1403.

¶78　McCord foresaw the problem of the Supreme Court's faulty analysis which we are experiencing by this decision when he stated:

> The first problem is that if the court really intended the evidentiary definition to govern, the realm of automatic reversible structural error would expand dramatically because there are a large variety of nonevidentiary constitutional errors. While ideologies can debate whether such an expansion would be a good result as a matter of policy, it is clear that the court–which adheres to the position that structural error is the exception–did not intend that result.

McCord, The Trial Structural Error Dichotomy, 45 U.Kan.L.Rev. at 1413.

¶79    McCord also notes the difficulty with consistent application of the Supreme Court's dichotomy. For example, if we use the "durational" definition for trial error which is discussed in paragraph 47 of our LaMere opinion, when does it begin and end?  McCord noted:

> [T]he Court left several key ambiguities dangling.  First, what is the beginning point of the duration–the start of voir dire, the moment the jury is sworn in, or the beginning of the prosecution's opening statement?  Second, what is the end point of the duration–the end of the jury instructions or the return of the verdict...?  Third, whatever the starting and ending points, is every moment in between included, or only the times when court is in session?

McCord, The Trial Structural Error Dichotomy, 45 U.Kan.L.Rev. at 1414.

¶80    In conclusion, McCord noted that:

> The Fulminante dichotomy is a badly conceived and badly explained doctrine.  Thus, it is not surprising that Fulminante has proven to be unsatisfactory precedent, both for the Supreme Court itself and for the lower courts.  It is to the first era of this unhelpful legacy of case law spawned by Fulminante that I will now turn my attention.

McCord, The Trial Structural Error Dichotomy, 45 U.Kan.L.Rev. at 1416.

¶81    The post-Fulminante Supreme Court decisions to which McCord referred include Brecht v. Abrahamson (1993), 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353, and Sullivan v. Louisiana (1993), 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182, in which the Supreme Court has arguably already begun to back away from the arbitrary, sometimes illogical and often unworkable "trial"/"structural" dichotomy for analyzing whether error is harmless or requires automatic reversal.

¶82    McCord concludes his analysis with the following observation:

> The court in Fulminante substituted a new dichotomy (or maybe not, depending on which of the conflicting definitions of "trial error" one focuses on) seemingly to reach the result the majority wanted as to a particular constitutional issue–coerced confessions–that it felt was on the wrong side of the Chapman dichotomy.  Since then, in Brecht and Sullivan, the Court has been trying to distance itself from the dichotomy without repudiating it, but also without substituting any better  mode of analysis.  This has resulted in two lamentable consequences: (1) the lower courts are plainly and understandably confused concerning what mode of analysis to apply; and (2) the real issues concerning whether errors should be reversible are often obscured by the unneeded overlay of the dichotomy.

McCord, The Trial Structural Error Dichotomy, 45 U.Kan.L.Rev. at 1460.

¶83    I agree.

¶84 We first followed the "trial"/"structural" dichotomy for analyzing district court error in State v. LaMere, 2000 MT 45, 298 Mont. 358, 2 P.3d 204. In that case the question was whether summoning prospective jurors by telephone (a process which we concluded violated the method prescribed in § 3-15-505, MCA (1997)) was automatically reversible or could be harmless if "actual prejudice" was not demonstrated. We overruled our prior decision in State v. Robbins, 1998 MT 297, 292 Mont. 23, 971 P.2d 359, and held that failure to substantially comply with Montana's statutes governing the procurement of a jury required per se reversal. We reasoned that:

> The underlying "purpose of the jury selection statutes is to provide random selection of jurors from the entire panel or array,...thus securing a fair and impartial jury." [citations omitted.]
>
> In short, the objective procedures established by the Montana legislature for the random selection of jurors are intended to protect a criminal defendant's fundamental right to a fair and impartial jury, as guaranteed by Article II, Sections 24 and 26 of the Montana Constitution and by the Sixth and Fourteenth Amendments the United States Constitution. We construe this substantial compliance standard as being designed to protect a defendant's fundamental right to an impartial jury, primarily, by encouraging reasonably strict compliance with statutory procedures intended to implement, and thereby secure the fair cross section guarantee of the Sixth Amendment.

LaMere, ¶¶ 34-35.

¶85 Because the defective process by which the jury was summoned in LaMere did affect the defendant's right to a fair cross section, I agreed in LaMere that the basic structure by which his trial occurred was compromised and that automatic reversal was necessary. I still agree with the result. However, denial of a peremptory challenge (which is what in effect occurs when the district court abuses its discretion by denying challenges for cause) does not affect the constitutional right to a fair cross section and, while I presume it to be prejudicial, does not rise to the same constitutional magnitude as the selection process at issue in LaMere. In fact, denial of peremptory challenges basically concern a party's right to determine who the particular jurors are who will sit on a jury. In LaMere we noted that "Montana case law has consistently held that a party has no right to have a particular member of the panel sit on a case." LaMere, ¶ 37 (citing Tribby v. Northwestern Bank of Great Falls (1985), 217 Mont. 196, 704 P.2d 409, 416).

¶86 What I now believe was unnecessary in LaMere was our additional discussion by which we subscribed to the Supreme Court's analysis of error as either "trial" error or "structural" error and then felt the need to adopt that analysis in order to justify automatic reversal of LaMere's conviction for the District Court's failure to summon a fair cross section.

¶87 We next considered "structural" error versus "trial" error in State v. VanKirk, 2001 MT 184, 306 Mont. 215, 32 P.3d 735. In VanKirk, we reconsidered prior reasoning in Brodniak v. State (1989), 239 Mont. 110, 115, 779 P.2d 71, 74, that error could be found harmless when balanced against "the

overwhelming evidence and the totality of the circumstances." VanKirk, ¶ 32. In an effort to arrive at a reasonable process for reviewing trial court error without simply weighing the effect of the prejudicial evidence against admissible evidence on a case-by-case basis, we adopted a two-step process by which we first assumed that "structural" error as defined by the U.S. Supreme Court in Fulminante is automatically reversible and then arrived at a new method for determining whether "trial" error was actually prejudicial. Again, I have no problem with the ultimate conclusion that some district court error is of such magnitude and involves such important constitutional rights that reversal is required. However, now having had an opportunity to observe the misapplication of such a wooden and arbitrary dichotomy, I would no longer follow it.

¶88 The majority reasons that because in VanKirk we rejected the "overwhelming evidence rule," we must also now reject our prior decisions in State v. Williams and State v. DeVore (which presume prejudice for errors during jury selection) and substitute the VanKirk "two step analysis to determine whether an error prejudiced a criminal defendant's right to a fair trial and is, therefore, reversible." Having done so, the majority concludes that improper denial of challenges for cause during voir dire is structural because it precedes the presentation of evidence and affects the framework in which the trial proceeds. First, I disagree that VanKirk has any application to this case. The purpose of the VanKirk analysis is to determine whether trial court error is prejudicial. That analysis is unnecessary in a circumstance where error is presumed. We have long presumed that granting one party more peremptory challenges than the other (the practical effect of denying meritorious challenges for cause) is prejudicial. See, e.g., King v. Special Resource Mgmt., Inc. (1993), 256 Mont. 367, 846 P.2d 1038; State v. Williams (1993), 262 Mont. 530, 866 P.2d 1099; and State v. DeVore, 1998 MT 340, 292 Mont. 325, 972 P.2d 816. Trying to superimpose a process by which we determine whether error was prejudicial on a situation where prejudice is presumed leaves us with the strange result that a coerced confession can now be reviewed to determine whether it was harmless but the tactical advantage resulting from an extra-peremptory challenge is automatically reversible. By classifying the District Court's abuse of discretion under these circumstances as "structural," we have arrived at the correct result in this case but have fit a square peg into a round hole which will surely lead to absurd results in the future.

¶89 Furthermore, the majority's conclusion that we weigh mistakes during the jury selection process against the "overwhelming evidence" in criminal cases is not correct. We did so in Williams. However, that rule was changed substantially in DeVore to reflect the reality of criminal litigation. As noted by Justice White in his portion of the Fulminante opinion:

> For example, a judge in a criminal trial "is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict, [citations omitted] regardless of how overwhelming the evidence may point in that direction."

Fulminante, 499 U.S. at 294.

¶90 We recognized that reality in our DeVore decision and, therefore, distinguished the effect of an error in jury selection in civil cases as opposed to criminal cases when we pointed out that:

The role of a jury in both civil and criminal cases is to resolve disputed issues of fact. It follows that where there are no disputed issues of fact, the jury, and therefore the potential influence of its individual constituents, "biased" or not, is inconsequential to the final outcome of the case. On the other hand, where issues of fact do exist, the jury is the ultimate trier of the case and fairness requires that both parties have equal opportunity to shape the jury's composition by being provided an equal number of peremptory challenges. However, prejudice to a party from an erroneous denial or a challenge to a jury for cause can only occur if a question of fact exists.

Theoretically, in a civil context, cases which present no issue of fact should not reach a jury.

Criminal cases are different. On the one hand, Section 46-16-403, MCA, authorizes a district court, upon either its own initiative or a motion by the defendant, to dismiss the case against a defendant before the matter reaches a jury based on its determination that the factual evidence is insufficient to support a guilty verdict. However, our criminal justice system does not provide the state a comparable procedural method by which to prevail absent submission of the evidence to the jury. That is, no matter how uncontroverted the state's evidence, our system guarantees a defendant the right to have his guilt determined by a jury of his peers. See Article II, Sec. 24 and 26, Montana Constitution. The effect of this protection is that a jury may occasionally be called upon to decide a criminal case even in the absence of a genuine issue of fact. [Citations omitted.]

DeVore, ¶¶ 37-39.

¶91 We then modified our holding in Williams that errors during the jury selection process must be balanced against the totality of the circumstances and held that:

In light of the presumption and our above analysis, a defendant on appeal need not show actual prejudice. Rather, he need only establish that the jury was charged with the determination of a factual issue important to the charges against him.

DeVore, ¶ 41.

¶92 The modification of Williams by DeVore is the second reason why the VanKirk analysis is not applicable to this case. We no longer weigh errors in the jury selection process against the overwhelming evidence to determine whether the error was prejudicial. Prejudice is presumed. The only exception occurs when there are no issues of fact for the jury to decide. I believe that retaining this exception is critical to maintaining public confidence in the criminal justice system.

¶93 The majority opinion straps future courts into an appellate straight jacket. Where district courts

abuse their discretion in the jury selection process, this Court will have no basis for affirming a conviction regardless of how heinous the crime and regardless of whether there were factual issues for the jury to decide.

¶94   In order to avoid absurd results which endanger the public and bring public ridicule upon this Court, future members will instead find ways to conclude that there was no abuse of discretion when a challenge for cause is denied.  That's only human nature.  In the process, the rules for obtaining an impartial jury will be eroded, defendants will gradually be denied an equal number of peremptory challenges, and the majority will have achieved the exact opposite of its intended result.

¶95   Because I strongly believe in the importance of challenges for cause and peremptory challenges, because I believe there is an undisputed tactical advantage for one side which is able to exercise more peremptory challenges than the other, and that the ultimate effect of the majority's opinion will be to erode the consistency by which we enforce a defendant's right to challenges for cause, I dissent from that part of the majority opinion which adopts the "trial"/"structural" dichotomy to the jury selection process and requires automatic reversal of every criminal conviction in which a district court has abused its discretion during the jury selection process.

/S/ TERRY N. TRIEWEILER

Justice Jim Rice concurring in part and dissenting in part.

¶96   I concur with the Court's holding that Good was not denied a speedy trial, but dissent from the holding that Good is entitled to a new trial due to the District Court's denial of Good's challenges for cause.

¶97   I concur with Justice Trieweiler's discussion on the proper analysis to be employed to our review of district court rulings on cause challenges.  A district court's error in denying a challenge for cause constitutes neither pre-trial structural error (exemplified by the violation of jury summoning statute in LaMere) nor trial error (exemplified by the admission of tainted evidence in Van Kirk), as definitions of those errors are set forth in Van Kirk.  Rather, challenges for cause are reviewed under a unique deferential abuse of discretion standard.  If abuse of that discretion is found, it remains appropriate in criminal cases to inquire whether the jury was charged with determining factual issues that could have been affected by the error, as the Court recently established in DeVore.  Failure to retain the DeVore standard will result in some reversals that will serve no purpose whatsoever–aptly described by Justice Trieweiler as the inevitable result of an "appellate straight jacket" standard of review.  That said, I would not reach the issue over which standard to apply in the wake of a district court's error in denying a challenge for cause, as I find no such error in this case.

¶98   This Court has gone to great lengths to defer to district courts' decisions in these matters. "Because the trial court is best able to observe the jurors and to decide the potential for prejudice . . . the trial court has significant latitude when ruling on such matters. [Citation omitted.]  This Court gives the trial court's determination considerable weight and will defer to that determination . . . ."  State v.

Hatten, 1999 MT 298, ¶ 28,  297 Mont. 127, ¶ 28, 991 P.2d 939, ¶ 28 (emphasis added).   While Hatten dealt with alleged juror misconduct, our deference there to the district court's personal observations is equally applicable in the context of this case.

¶99    After reviewing the respective colloquies between the judge and panelists Gregory and Acheson, the Court concludes that "[t]he District Court abused its discretion when it chose to ignore the prospective jurors' spontaneous and honest statements indicating that they could not be impartial in favor of its own attempt to rehabilitate the jurors." ¶ 55.  This conclusion inaccurately summarizes both the answers given by the panelists and the efforts of the trial judge.

¶100    It should first be noted that neither panelist Gregory nor panelist Acheson indicated that they would not presume Good innocent when that question was posed to the panel as a whole.  Furthermore, neither of them indicated that they could not be impartial, as the Court asserts.  A more accurate assessment is that the panelists expressed uncertainty about acting impartially, and it was that uncertainty–not expressions of partiality–which the judge attempted to clarify.

¶101    Panelist Gregory's answer to defense counsel, set forth at ¶ 45, was not definitive, but expressed her tendency to believe a victim.  After being asked whether she could withhold forming an opinion until after the evidence was presented, she indicated "I would try."  When the judge intervened to clarify her answer, Gregory rebutted the judge's assumption that perhaps she had already made up her mind: "No, I haven't made up my mind, but I would have a hard time."  When the judge asked whether she was predisposed to a conviction, she again declined that assessment.  To assist her, the judge then provided an accurate explanation of the process, but did not engage in an effort to dissuade her from a preconceived belief, which this Court criticized in DeVore.  Finally, the judge asked: "I don't care what they allege, they better prove each and every one of these.  Do you think you could be of that frame of mind?"  To this panelist Gregory answered clearly and positively that she could so act.

¶102    Similarly, panelist Acheson, after expressing assent to the notion of Good's innocence, asked her own question:  "I guess what I worry about is if I have to err on one side or the other, I'm not sure which way to go.  What do I do?"  In response to this very good question about the duty of a juror, the judge accurately explained that any error must be made in the defendant's favor.  Acheson then indicated that, notwithstanding the difficulty in the process, she could act dispassionately and apply the law as given.

¶103    Panelists come to trials with a variety of experiences, values and opinions.  The purpose of voir dire is to expose these feelings to the court, as well as to explain the trial process and the role of jurors to act impartially, and to determine, given that role, whether jurors could so act.  Voir dire need not be a reactionary process which eliminates all panelists who honestly offer any doubt, whether about themselves or about the process.  Few panelists come to the process with a full understanding of the juror's duty, or of their ability to perform it.  Instead of rigidly dismissing panelists who have questions about the process, courts should ensure that their doubts are respectfully discussed, and if credibly and properly resolved, allow them to remain on the panel.  If not resolved credibly and properly, then they should be dismissed from the panel.

¶104    The cold, dry transcript leaves room for argument on these challenges made in this case.

However, the transcript fails to reveal the appearance, demeanor, tone of voice, attitude, reactions, body posture and facial expressions of the panelists. For good reason, our law requires deference to the trial judge's personal observation of these indicators. I find the combination of a prospective juror's statements, made under oath, and a district judge's observation of these indicators far more reliable then the Court's perceptions of "human nature." ¶ 55. Applying the appropriate standard of review, I would find no abuse of discretion. A review of the record reveals that the District Court conducted voir dire very carefully in this matter, excusing three jurors for cause prior to addressing the concerns raised by juror Gregory and juror Acheson. I would affirm the conviction herein.

/S/ JIM RICE