FILED

04/12/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0508

DA 20-0508

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 73

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

ANGELA DAWN BENNETT,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-20-122
Honorable Shane A. Vannatta, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Peter Wood, Attorney at Law, Boise, Idaho

      For Appellee:

      Austin Knudsen, Montana Attorney General, Bree Gee, Assistant Attorney
General, Helena, Montana

      Keithi Worthington, Chief Prosecuting Attorney, Missoula City Attorney's
Office, Missoula, Montana

Submitted on Briefs:  January 26, 2022

Decided:  April 12, 2022

Filed:

_____
Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1     Defendant Angela Dawn Bennett appeals the September 14, 2020 Opinion and Order by the Fourth Judicial District Court, Missoula County, affirming the decision of the Missoula Municipal Court's denial of Bennett's motion to dismiss for insufficient evidence the charge of obstructing a peace officer. We address the following issue:

> *Whether the District Court erred in affirming the Municipal Court's denial of Bennett's motion to dismiss for insufficient evidence.*

¶2     We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     On June 27, 2019, Missoula City Police Officer Shaun Loya responded to a call from the Poverello Center (Poverello) following a report that Bennett had violated an order of protection by entering the facility. After speaking with the Poverello staff, Officer Loya spotted Bennett across the street with a few other people. Officer Loya recognized Bennett from previous interactions with her and approached her on foot.

¶4     Officer Loya's engagement with Bennett from initial encounter to arrest lasted approximately forty seconds and was captured by Officer Loya's body camera. The entirety of the forty-second exchange is as follows:

OFFICER LOYA:     Angela, talk to me, before you eat, talk to me, okay.

BENNETT:     Talk to you about what?

OFFICER LOYA:     Well, I got to talk to you about something that someone reported to me, okay.

BENNETT:     About what?

2

OFFICER LOYA:       Well, inside the Poverello.

BENNETT:            I have not been in that Poverello for three years.

OFFICER LOYA:       For three years, okay.

BENNETT:            So, I don't know what the fuck you're talking about. . . .
                    Three fucking years. . . . C'mon.

OFFICER LOYA:       So, Angela, anything else you want to tell me?

BENNETT:            Man, you people are dumb.

OFFICER LOYA:       Okay.  Nope.  Let's go.  Drop your food.

BENNETT:            You're arresting me?  For what?

OFFICER LOYA:       Temporary order of protection violation.

¶5    The City charged Bennett with violating an order of protection and obstructing a peace officer by "attempt[ing] to walk away from officers while being questioned."  The matter proceeded to a bench trial before the Missoula Municipal Court.  During trial, the City moved to voluntarily dismiss the charge of violating an order of protection and the Municipal Court dismissed that charge.  Officer Loya was the only witness to testify, and the City submitted Officer Loya's body camera footage into evidence.  At the close of the City's case, Bennett moved to dismiss the obstruction charge for insufficient evidence.  Bennett contended that the City failed to prove she knowingly obstructed Officer Loya's enforcement of the law because the officer failed to inform her that she was being detained

or otherwise required to remain on scene to answer his questions. The Municipal Court denied the motion as untimely and without merit.[1]

¶6 Bennett appealed the order denying her motion to dismiss to the District Court. The District Court addressed the merits of Bennett's motion to dismiss and affirmed the Municipal Court, holding that there was sufficient evidence in the record to support her conviction for obstruction.

## STANDARDS OF REVIEW

¶7 We review a district court's denial of a motion to dismiss for insufficient evidence de novo. *State v. Gregori*, 2014 MT 169, ¶ 5, 375 Mont. 367, 328 P.3d 1128. "We review a question on the sufficiency of the evidence to determine whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Booth*, 2012 MT 40, ¶ 7, 364 Mont. 190, 272 P.3d 89 (citing *State v. Azure*, 2008 MT 211, ¶ 13, 344 Mont. 188, 186 P.3d 1269).

## DISCUSSION

*Whether the District Court erred in affirming the Municipal Court's denial of Bennett's motion to dismiss for insufficient evidence.*

¶8 Bennett argues that the City failed to present evidence at trial that Officer Loya seized her, and she retained her legal right to walk away from her consensual interaction

---

[1] A motion to dismiss for insufficient evidence may be made at the close of the prosecution's evidence or at the close of all the evidence. *Gregori*, ¶ 5 (citing § 46-16-403, MCA). Bennett's motion was timely, and we consider the merits of the motion to dismiss for insufficient evidence.

with Officer Loya. Bennett argues that the City could not, as a matter of law, prove she committed the crime of obstruction.[2] The City argues that, irrespective of whether Bennett was seized, the evidence viewed in a light most favorable to the prosecution was sufficient to establish Bennett knowingly obstructed Officer Loya's lawful duties. We need not consider whether Bennett was seized during the encounter because, under any circumstances, the evidence was insufficient to support a conviction for obstruction.

¶9      In *City of Kalispell v. Cameron*, 2002 MT 78, 309 Mont. 248, 46 P.3d 46, Cameron was the passenger in a vehicle that pulled into the parking lot of a restaurant. *Cameron*, ¶ 4. Two officers observed the vehicle driving erratically and decided to investigate. *Cameron*, ¶ 4. By the time the officers approached the vehicle, Cameron had exited the truck and was walking toward the restaurant. *Cameron*, ¶ 5. An officer ordered Cameron to get back into the truck, but Cameron refused. *Cameron*, ¶ 5. After the officer repeated the command for Cameron to get back into the truck, Cameron swore at the officer and turned away to enter the restaurant, at which point the officer arrested him. *Cameron*, ¶ 5. We reversed Cameron's conviction for obstructing a peace officer. Relevant to this case, we noted that Cameron did not obstruct the officers in the performance of their duties and Cameron had "no reason to know why he was being investigated or arrested." *Cameron*, ¶ 12.

---

[2] Bennett's argument requires consideration of whether she had a constitutional right to walk away. However, because the City did not establish that her conduct constituted obstruction even if she did not have the constitutional right to walk away, we need not address that issue. This Court will avoid constitutional issues whenever possible. *Weidow v. Uninsured Emp'rs' Fund*, 2010 MT 292, ¶ 22, 359 Mont. 77, 246 P.3d 704.

¶10    For a person to knowingly obstruct an officer's lawful duty, the defendant must be aware that her conduct is highly probable to hinder the performance of that duty. *Cameron*, ¶ 11. The evidence in this case is undisputed and Officer Loya's body camera depicts his entire interaction with Bennett. Even viewed in a light most favorable to the prosecution, there is nothing in Bennett's forty-second encounter with Officer Loya that supports a determination that Bennett hindered Officer Loya's performance of his duty, much less that she was aware her conduct was highly probable to hinder the performance of that duty. Bennett was never advised that she was the subject of an investigation, only that Officer Loya wanted to talk to her about "something that someone reported to [him]" about something "inside the Poverello." Although Bennett's responses to Officer Loya's inquiries may have been coarse, she fully engaged with him and responded to all of his questions. The last words Officer Loya spoke to Bennett before she turned to walk away was an open-ended and equivocal, "So, Angela, anything else you want to tell me?" While Bennett's response to this final inquiry was disrespectful, it was nonetheless a response, after which Officer Loya immediately arrested her. The evidence here is even more tenuous than in *Cameron*, where we found it insufficient to sustain an obstruction charge when Cameron ignored repeated orders to get back in the truck before being arrested.

¶11    The Dissent attempts to distinguish *Cameron* by noting that in this case "Bennett's actions, and not the actions of a third party, were the reason Officer Loya first approached." Dissent, ¶ 17. But while Officer Loya knew he wanted to talk to Bennett about her alleged actions, he never advised Bennett of that fact, other than vaguely saying it was "about something that someone reported to me." Even after Bennett pointedly asked

6

Officer Loya what he wanted to talk to her about, he again vaguely responded "Well, inside the Poverello," to which Bennett responded that she had not been in the Poverello for three years. The Dissent also misapprehends our principal reliance on *Cameron*. In *Cameron* we concluded that Cameron did not, in fact, obstruct the officers because, despite Cameron ignoring repeated orders to get back in the truck, Cameron's companion was arrested without incident and Cameron did not impair the arrest. *Cameron*, ¶ 12. In this case, after responding to all of Officer Loya's questions, Bennett turned to walk away as she was responding to what was, by all appearances, the end of Officer Loya's inquiry: "So, Angela, anything else you want to tell me?" In that moment, Bennett was immediately arrested without incident.[3] Whether or not Bennett's behavior may have been, as the Dissent characterizes it, "dismissive at best," Dissent, ¶ 17, it would be a frightening departure if we were to begin imposing criminal liability on defendants because we found their responses to an officer's questions lacking in etiquette.

## CONCLUSION

¶12 We reverse the District Court's Order affirming the Municipal Court and direct that a judgment be entered acquitting Bennett of the charge of obstructing a peace officer.

/S/ JAMES JEREMIAH SHEA

---

[3] There is no issue here that Bennett's arrest for temporary order of protection violation was supported by probable cause and was lawful. The issue before this Court is whether Bennett's conduct preceding that arrest hindered Officer Loya's performance of his duty, or that she was aware her conduct was highly probable to hinder the performance of that duty.

We Concur:

/S/ MIKE McGRATH
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR

Justice Laurie McKinnon, dissenting.

¶13     I dissent.  For a defendant to be found guilty of obstructing a peace officer, the State must show the defendant (1) knowingly, (2) obstructed, impaired, or hindered, (3) the enforcement of the criminal law.  Section 45-7-302(1), MCA.  Applicable to the charge of obstructing a peace officer, the definition of "knowingly" under § 45-2-101(35), MCA, requires awareness that it is highly probable that the defendant's conduct will obstruct, impair, or hinder the officer's performance of his or her governmental function.  *See State v. Johnston*, 2010 MT 152, ¶¶ 10, 12, 357 Mont. 46, 237 P.3d 70.  A "result-based" mental state applies to the crime of obstruction.  *Johnston*, ¶ 10.  Accordingly, the State was required to prove that Bennett was aware of a high probability that her conduct would impede Officer Loya's investigation.  *See Cameron*, ¶ 11.

¶14     "The existence of a mental state may be inferred from the acts of the accused and the facts and circumstances connected with the offense."  *State v. Fleming*, 2019 MT 237, ¶ 20, 397 Mont. 345, 449 P.3d 1234 (concluding that a rational jury could find the defendant aware of a high probability that buying an 18-year-old a half-gallon of 80-proof whiskey would create a substantial risk of death or bodily injury).  In its discussion of the evidence, the Court fails to mention that Officer Loya told two other people standing with Bennett that they were free to go and that Officer Loya had two additional officers present

8

with him. Officer Loya told Bennett he needed to talk to her about a "report" that someone made inside the Poverello Center. Yes, the encounter was brief. But we review the trial evidence in a light most favorable to the prosecution. *Booth*, ¶ 7. "The issue is whether [Bennett] engaged in conduct that impeded the performance of [Officer Loya's] lawful duties under circumstances that made [Bennett] aware it was highly probable [her] conduct would impede the performance of those duties." *State v. Eisenzimer*, 2014 MT 208, ¶ 11, 376 Mont. 157, 330 P.3d 1166.

¶15 "It is within the province of the [fact-finder] to weigh the evidence based on the credibility of the witnesses and to determine which version of events should prevail." *Fleming*, ¶ 12 (citation omitted). "We therefore review [the] verdict to determine whether sufficient evidence exists to support the verdict, not whether the evidence could have supported a different result." *Fleming*, ¶ 12 (citation omitted). *See also State v. Baker*, 2004 MT 393, ¶¶ 9, 22, 325 Mont. 229, 104 P.3d 491 (emphasizing that "the jurors are the fact finders" and finding sufficient evidence to support a conviction for attempted obstruction when the defendant left a message on her neighbor's answering machine that there was a "SWAT [team] on the corner" and "it might be in [his] best interests to look outside.").

¶16 The trial court in this case heard witness testimony and saw, through Officer Loya's body camera video, the facts and circumstances connected with the offense: multiple police officers at the scene, the bystanders walking away only after receiving permission, and Officer Loya advising Bennett that he needed to talk to her about a report that someone made. Viewing this evidence in a light most favorable to the prosecution, I would conclude

9

that it could convince a rational trier of fact beyond a reasonable doubt that Bennett was aware of a high probability that ignoring Officer Loya and walking away would impede the lawful performance of Officer Loya's duty to investigate a report of alleged criminal conduct.

¶17    Instead, the Court choses to rely on *Cameron*, which remains easily distinguishable from the facts here.[1]  As the Court notes, *Cameron* involved the investigation of a third party, not Cameron.  *Cameron*, ¶ 4.  Indeed, the investigation of a third party would naturally lead any individual to "ha[ve] no reason to know why he was being investigated or arrested."  *Cameron*, ¶ 12.  However, Bennett's actions, and not the actions of a third party, were the reason Officer Loya first approached.  Restated, *Cameron* would have more applicability here if Officer Loya had arrested one of the individuals standing with Bennett as he approached.  That is not the case here.  In my opinion, Bennett's behavior was dismissive at best, and I disagree with the Court's view that she fully engaged with, and responded to, Officer Loya's questions.  Officer Loya had, at a minimum, particularized suspicion that Bennett had violated an order of protection.  When Officer Loya approached Bennett for questioning, she was not free to walk away, as she did, from his investigatory stop.  When she undisputedly refused to answer Officer Loya's questions and then walked away, there was sufficient evidence that she had obstructed his investigation.

---

[1] I further note, notwithstanding the factual differences, *Cameron* was decided on Cameron's brief alone and without the benefit of any countervailing arguments by the City, leading the Court to view Cameron's "versions and positions as being correct if they are supported by the record." *Cameron*, ¶¶ 14-15 (Nelson, J., concurring).  That is not the case here.

¶18 The Court's holding hinges on Officer Loya's failure to expressly inform Bennett she was under investigation. That is no longer what the law in Montana requires, and the Court fails to grapple with this fact; instead the Court demands that Officer Loya immediately and forcefully inform Bennett she was under investigation. In 2003, the Legislature passed House Bill 40 ("HB 40"), amending § 46-5-401, MCA, in response to our invitation to do so in *State v. Krause*, 2002 MT 63, ¶ 37, 309 Mont. 174, 44 P.3d 493.[2] *See also* H.B. 40, 58th Leg., Reg. Sess. (Mont. 2003); *House Judiciary Committee Hearing Minutes in re HB 40* at 10 (Jan. 20, 2003) (Introductory statement of Mont. Rep. Brad Newman, Sponsor). In so doing, the Legislature combined §§ 46-5-401 and 46-5-402, MCA (2002), and, pertinently, removed the requirement under § 46-5-402(4), MCA (2002), for officers to inform any person lawfully stopped under § 46-5-401, MCA, "that the officer is a peace officer, that the stop is not an arrest but rather a temporary detention for an investigation, and that upon completion of the investigation, the person will be released if not arrested." One proponent of HB 40 noted it "is very frightening for a motorist to receive that type of warning in a traffic stop[.]"[3] *Senate Judiciary Committee Hearing Minutes in re HB 40* at 13 (March 11, 2003).

¶19 Another proponent of HB 40 noted, in response to a question asking what would happen where an individual "refuses to provide any information and whether that would

---

[2] This legislative change occurred after *Cameron*, rendering *Cameron* further inapplicable.

[3] While HB 40's proponent and much of the testimony refers to "the motorist" and vehicle stops, nothing in the plain language of § 46-5-401, MCA, limits its applicability solely to motorists or vehicles.

trigger an arrest[,]" that "it comes down to the driver providing the information or be[ing] arrested for obstruction of justice." *House Judiciary Committee Hearing Minutes in re HB 40* at 12 (Jan. 20, 2003). Representative Brad Newman, the sponsor of HB 40, testified that the "intent of the bill is to allow the officers to be much more informal and cordial with the suspect rather than confrontational." *Senate Judiciary Committee Hearing Minutes in re HB 40* at 13 (March 11, 2003).

¶20 As the Legislature intended, Officer Loya attempted to interact with Bennett, an individual he knew well, cordially and informally. Officer Loya testified that he had numerous interactions with Bennett during his time with the Missoula Police Department and knew her on sight. He addressed her by her first name and asked to talk to her about "something that someone reported" to him.[4] The Court gives Bennett the benefit of the doubt, concluding that she had no reason to know why Officer Loya approached her. The Court ignores the reality that, when a uniformed police officer asks to talk to a citizen "about something that someone reported" to them, the officer does not wish to discuss the weather or if the individual watched the New York Knicks lose the night before. Bennett refused to engage, triggering an arrest for obstruction, as the proponent of HB 40 predicted. In response, the Court's holding implicitly reinstates the repealed requirement of § 46-5-402(4), MCA (2002), contrary to the Legislature's express intent.

---

[4] In my opinion, aggressive tactics, including immediately and directly informing an individual they are under investigation, would only serve to set the individual on the defensive and would likely increase the number of investigations ending in arrests.

¶21 I see no need to address whether Bennett had a constitutional right to walk away. Officer Loya lawfully stopped Bennett pursuant to § 46-5-401, MCA. Under § 46-5-401(1), MCA, a peace officer may stop any person to "verify an account of the person's presence or conduct" so long as the officer has a particularized suspicion that the person has committed, is committing, or is about to commit an offense. Particularized suspicion requires specific and articulable facts known to the officer that result in an objective, reasonable suspicion that a person is engaged, or is about to engage, in criminal activity. *City of Missoula v. Kroschel*, 2018 MT 142, ¶ 11, 391 Mont. 457, 419 P.3d 1208.

¶22 Officer Loya possessed, at minimum, a particularized suspicion of wrongdoing by Bennett.[5] Officer Loya received a report about an order of protection violation by Bennett, resulting in the objective suspicion Bennett was engaged in criminal activity, and sought to ask Bennett some questions related to that report. We have previously recognized that "asking questions is an essential part of police investigations." *Kroschel*, ¶ 14 (citations omitted). Indeed, Montana law codifies this concept under § 46-5-401(2)(a), MCA (allowing an officer to request an individual's name, present address, and an explanation of the person's actions). We have also recognized that criminal liability for obstructing a peace officer arises from a failure to comply with an officer's lawful request for such information. *Kroschel*, ¶ 15; § 45-7-302(1), MCA. Bennett walked away as Officer Loya

---

[5] Officer Loya testified that he believed he had probable cause to arrest Bennett. Section 46-5-401, MCA, requires only a particularized suspicion to justify an investigative stop.

13

sought to ask her some questions, hindering Officer Loya's investigation of the complaint, and criminal liability ensued.

¶23 The Court suggests I would impose criminal liability simply because Bennett's responses "lack[ed] in etiquette." Opinion, ¶ 11. To the contrary, I am mindful of the need to prevent the police from "target[ing] pedestrians in an arbitrary manner" and "treating members of our communities as second-class citizens." *State v. Pham*, 2021 MT 270, ¶ 23, 406 Mont. 109, 497 P.3d 217 (citations omitted). The Court suggests my view represents a "frightening departure" from our precedent and distorts my point to hide its failure to consider whether Bennett was lawfully detained pursuant to a particularized suspicion that she was engaged in wrongdoing. Opinion, ¶ 11. The Court's effort to find Bennett's answers responsive further ignores the fact that her answers failed to dispel Officer Loya's particularized suspicion. In my opinion, it is the Court who departs from our precedent. *See Kroschel*, ¶¶ 19-20 (concluding "sufficient particularized suspicion of criminal activity (*i.e.* [minor in possession] and obstructing a peace officer)" existed when an individual provided false information to police during a lawful investigatory stop).[6]

¶24 In my opinion, this Court has inappropriately substituted its own assessment of the weight and credibility of the evidence for that of the trial court. A review of the evidence in a light most favorable to the prosecution demonstrates that a reasonable trier-of-fact

---

[6] This is not to suggest Bennett knowingly provided false information. Rather, pursuant to confirming or dispelling a particularized suspicion, the distinction between false and nonresponsive information is minimal, if nonexistent.

14

could conclude that Bennett knew she was being stopped for questioning and that she nonetheless chose to walk away. The Court's holding also ignores the valid reason Officer Loya first approached Bennett and subverts the Legislature's intent by penalizing cordial and informal police interactions.

¶25    Respectfully, I dissent.


                                        /S/ LAURIE McKINNON


Justice Beth Baker and Justice Jim Rice join in the Dissent of Justice McKinnon.


                                        /S/ BETH BAKER
                                        /S/ JIM RICE