FILED

07/05/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0671

DA 19-0671

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 130

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

GENE DEVERAUX,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-Second Judicial District,
In and For the County of Carbon, Cause No. DC 2017-01
Honorable Matthew J. Wald, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Kristina L. Neal, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Helena, Montana

          Alex R. Nixon, Carbon County Attorney, Red Lodge, Montana

Submitted on Briefs: April 27, 2022

Decided: July 5, 2022

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Gene Deveraux (Deveraux) was convicted by a jury in the Twenty-Second Judicial District Court, Carbon County, of five felony sexual offenses against his former stepdaughter and one count of Sexual Intercourse Without Consent (SIWOC) against his former wife, B.J. He appeals all six convictions based on the District Court's denial of his motion to remove a prospective juror for cause. He alternatively challenges his SIWOC conviction against B.J. on the grounds the District Court gave two erroneous jury instructions.

¶2     We affirm and restate the issues as follows:

   1. *Was the District Court's denial of Deveraux's motion to remove a prospective juror for cause a structural error requiring reversal of Deveraux's convictions and a new trial?*

   2. *Did the District Court err by giving a conduct-based jury instruction defining mental state for the SIWOC offense against B.J., rather than a results-based definition?*

   3. *Should this Court exercise plain error review of an incorrect jury instruction on the definition of consent offered by Deveraux?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3     B.J. married Deveraux in March 2008. B.J. had four children when she married Deveraux, and three of them lived with the couple during the marriage, including D.S., who was seven years old when she became Deveraux's stepdaughter. The family enjoyed outdoor activities and maintained a residence in Billings and property in Bridger, Montana, where they spent weekends and worked on constructing a house. In May 2011, B.J. was driving herself, her son, and D.S. home from a concert when a drunk driver collided with

2

their vehicle. B.J. suffered major injuries—a broken pelvis, a shattered femur, a spinal injury, and severe nerve damage. She underwent multiple surgeries and bone grafts, remaining in the hospital for a month. Upon release, she was completely dependent on others for her daily care. During this time, Deveraux began sexually abusing B.J., which continued until the couple separated in July 2014. In November 2016, D.S. disclosed to her brother and her friend that Deveraux had sexually abused her since before Deveraux married her mother, starting when she was around four years old, and continuing until D.S. was about 13 years old, when B.J. and Deveraux separated. D.S.'s father reported the abuse to the authorities. D.S. was 18 years old at the time of trial.

¶4 Deveraux was charged with: Counts I and II, Incest against D.S., in violation of § 45-5-507, MCA; Count III, Sexual Assault against D.S., in violation of § 45-5-502, MCA; Counts IV and V, SIWOC against D.S., in violation of § 45-5-503, MCA; and Count VI, SIWOC against B.J., in violation of § 45-5-503, MCA. Deveraux pled not guilty to all charges and the matter proceeded to trial.

**Jury Selection**

¶5 Deveraux's jury trial occurred over five days in June 2019. During voir dire, a prospective juror advised the court she had personal family issues she would like to discuss privately. Due to the emotional nature of the charges, the District Court asked Deveraux's counsel to identify similarly situated individuals on the jury panel. Deveraux's counsel addressed the panel: "Who has these sort of -- those deep-seated issues, these incredibly personal relationships with people about rape, about child sexual abuse, that we're talking

3

about here today?" The District Court conducted individual voir dire with five prospective jurors who asked to speak privately about their experiences.

¶6 Prospective juror R.G. disclosed in chambers that his girlfriend had endured a marriage where "'no means no' did not apply in that relationship." He discussed how he believed it was hard to prosecute marital rape cases and how some people unfairly do not recognize it as a crime. R.G. stated, "I know the hardness of the person coming forward to testify on the stand, how incredibly horrible that would be. And I may have a problem in this area, out of sympathy." Deveraux's counsel asked, "If you were my client, would you want you on the jury?" R.G. responded, "I don't believe so . . . . I think to be fair to him, I should not be chosen." Deveraux's counsel moved to remove R.G. for cause.

¶7 The State questioned R.G.:

Q: There is no down[]side to find these offenses to be terrible. The only question I have now is, can you put that aside and basically fulfill your duty as a juror to listen to the testimony of the witnesses?

A: I can judge fairly. It's just an uncomfortable thing.

Q: You realize it's probably uncomfortable for anybody selected?

A: The question in the courtroom was: Does anybody know of? And I know of.

Q: . . . My only question is, if you can be fair and impartial.

A: I can be. I just -- well, I'm just like everybody else, I suppose. I just don't like it at all.

Based on R.G.'s responses, the State objected to defense counsel's challenge to remove him for cause.

¶8 The District Court then addressed R.G. directly:

4

Q: I do not mean to imply that the answer is yes. Okay? . . . I'm just asking you, given the facts that you dealt with through your friend, whether that is of a magnitude that you do not believe that you can be fair and impartial and base a verdict solely on the evidence here, or whether you think you can put that aside and go ahead and judge this case based on the information and evidence just provided in the courtroom?

A: I can judge this case by the evidence provided in the courtroom.

The District Court denied the motion and R.G. remained on the panel. Out of the five prospective jurors individually questioned in chambers, the court dismissed three for cause, retained one upon agreement of the parties, and retained R.G. over defense counsel's objection. Deveraux's counsel exercised all six of his peremptory challenges, but did not use one to remove R.G., and R.G. ultimately sat on the jury.

**Trial Testimony**

¶9     B.J. testified in detail about her injuries resulting from the car accident and Deveraux's sexual abuse occurring during her recovery.[1] When B.J. returned home from the hospital, she needed continual care. She lay flat on her back on a twin mattress on the living room floor, was in severe pain, and could not move independently or sit up to eat. She testified she was so fragile that if she coughed, someone had to "put a pillow over my hips and we just tried to hold [me] together." B.J. initially had a full-time catheter that required changing and cleaning to prevent infection. Her friend Kathy primarily cared for B.J. at home, and the family received assistance from their church community. However, when Kathy was not available, Deveraux was commonly responsible for B.J.'s care.

---

[1] Some of B.J.'s injuries were permanent. At the time of trial, B.J. still used crutches to walk and occasionally utilized a wheelchair. Her internal organs suffered irreversible damage.

¶10     B.J. testified that, after the accident, Deveraux became "completely different. He did not want to be married. He specifically said, 'I did not sign up for this.'" Deveraux wanted B.J. to file for divorce, but she refused out of fear she would lose the custody of her children to her ex-husband, with whom she was in a difficult custody battle. She could not care for herself or her children, had lost her job, and exhausted her medical insurance. She was completely dependent upon Deveraux, explaining, "I needed him to have my children, I needed him for a roof over my head. I needed him to take care of me. I needed him for everything."

¶11     During this time, Deveraux's attitude regarding his sexual relationship with B.J. also dramatically changed. B.J. testified that, before the accident, the couple had a "traditional" sex life, informed by her religious beliefs not to do "anything out of the ordinary stuff." After the accident, "there was no caring . . . it was violent, it was unloving." B.J. testified that her first post-accident sexual experience with Deveraux occurred during her first shower after returning home from the hospital. She was still severely injured—she had to be carried into the shower and sat on a plastic chair with arm and leg supports, leaning on an inflatable innertube to keep pressure off her broken pelvis. "I would hold myself up because I was still broke," B.J. testified. "I still had staples. I was black and blue and a catheter [was] just hanging out of me." Deveraux got into the tub with B.J., and she expected him to help her shower. Instead, Deveraux shocked B.J. by demanding oral sex. B.J. testified Deveraux "grabbed the back of my neck" and forced her to participate. She did not understand "how he didn't care that it was hurting me. And I'm trying to pull away

6

and he's pulling me towards him." Deveraux barely cleaned her afterward. B.J. testified that Deveraux forced her to have oral sex with him during every shower until she could bathe independently, "and if I didn't want to do that, I didn't get a shower." These showers occurred at Deveraux and B.J.'s residence in Billings, but the forced oral sex continued once they moved permanently to the Bridger property in 2012.

¶12 B.J. next testified about the first time she had vaginal intercourse with Deveraux after the accident—she was still immobile, confined to the bed in the living room, and had just removed the catheter. Deveraux picked her up off the mattress and propped her up on the couch with pillows.

> I told him I didn't want to have sex. And I told him it was going to hurt and it was hurting. Keep in mind, [I'm] still all stapled up. And I told him, "My bones are moving. My bones are moving." He said, "You're pinned together, your bones aren't moving. You're fine." . . . He didn't care, still had to have sex. I'm crying, I'm telling him to stop.

Deveraux did not stop and the next day B.J. had to reinsert the catheter.

¶13 Deveraux forced B.J. to engage in sexual acts that were against her religious beliefs and that left her swollen, bruised, and bleeding. B.J. described how Deveraux would force her to use sex toys that would hurt her: "And I told him he was hurting me and I told him they were cutting me and he just -- he didn't care." She tried to block Deveraux with her hands and "raked him on the face with [her] fingernails once." At one point she complied because she was afraid he might kill her. Deveraux also used anal sex as punishment when B.J. angered him. He first subjected her to forced anal sex when she was still in early recovery and using the catheter. One of B.J.'s daughters came to visit, and this angered

7

Deveraux, leading to forced anal sex. Afterwards, Deveraux told B.J., "Every time you piss me off, this is what's going to happen." She bled for several days thereafter. Kathy discovered the bleeding while cleaning B.J. and took her to the emergency room. Kathy later testified, "[I]t was a sufficient amount of blood that I was scared." B.J. hesitantly told Kathy what Deveraux had done. B.J. testified, and Kathy corroborated, that B.J. did not report the abuse to the police at the time because of her dependence on Deveraux, and because she did not know there were laws against marital rape and that she could be legally protected.

¶14 Deveraux testified to a radically different version of his relationship with B.J. following the accident. He confirmed his wife needed constant care and was "basically bedridden." He denied any forced oral sex while helping B.J. shower during her recovery. Deveraux testified that he did not have sexual contact with B.J. until "she was quite a bit better" and was no longer using the catheter, approximately a month after she was discharged from the hospital. According to Deveraux, B.J. consented to the interaction, did not tell him it was painful, and he arranged pillows to help make her more comfortable. He testified B.J. consented as a willing participant to oral sex, anal sex, and the use of sex toys. The couple's sex life was "not what it was prior to [the accident], but it was okay . . . . Nothing out of the ordinary." Deveraux categorically denied any forced or violent sex with B.J., of ever using sex as a punishment, and any sexual abuse of D.S. He asserted that all allegations of sexual abuse by B.J. and D.S. were "made up," and that he was the victim of their lies.

**Jury Instructions**

¶15   The District Court instructed the jury that, in order to find Deveraux guilty of SIWOC against B.J., the State needed to prove the following elements:

1. That Mr. Deveraux had sexual intercourse with [B.J.]; AND
2. That the act of sexual intercourse was without [B.J.'s] consent; AND
3. That Mr. Deveraux acted knowingly.

The District Court further instructed the jury with the State's proposed "conduct-based" definition of the mental state "knowingly"—"A person acts knowingly: when the person is aware of his or her conduct."  The court rejected Deveraux's proposed "results-based" instruction defining "knowingly" as "[a] person acts knowingly when the person is aware there exists the high probability that the person's conduct will cause a specific result."

¶16   For the definition of "consent," the District Court instructed the jury with Deveraux's proposed instruction:

> [T]he term "consent" means words or overt actions indicating a freely given agreement to have sexual intercourse or sexual contact.  An expression of lack of consent through words or conduct means there is no consent or that consent has been withdrawn.  A current or previous dating or social or sexual relationship by itself, or the manner of dress of the person involved with Mr. Deveraux in the conduct at issue, does not constitute consent.  Lack of consent may be inferred based on all of the surrounding circumstances and must be considered in determining whether a person gave consent.

The District Court rejected the State's proposed instruction, which defined "without consent" as "the victim is compelled to submit by force against herself . . . .  The term 'force' means:  the infliction, attempted infliction, or threatened infliction of bodily injury."

9

¶17 The jury convicted Deveraux on all six counts, and he moved for a new trial, arguing the District Court should have removed R.G. for cause and gave an incorrect mental state instruction. The District Court denied his motion.[2]

¶18 On appeal, Deveraux asks this Court to reverse all six convictions and remand for a new trial based on the District Court's retention of R.G. on the jury, or, alternatively, for reversal of his conviction and a new trial for the SIWOC offense against B.J., based on his contention the jury instructions regarding mental state and consent were incorrect.

## STANDARDS OF REVIEW

¶19 We review a district court's denial of a challenge to remove a prospective juror for cause for abuse of discretion. *State v. Morales*, 2020 MT 188, ¶ 7, 400 Mont. 442, 468 P.3d 355 (citing *State v. Anderson*, 2019 MT 190, ¶ 11, 397 Mont. 1, 446 P.3d 1134). "A district court abuses its discretion if it denies a challenge for cause when a prospective juror's statements during voir dire raise serious doubts about the juror's ability to be fair and impartial or actual bias is discovered." *Anderson*, ¶ 11 (citation omitted). "If the defendant subsequently used a peremptory challenge to strike the prospective juror and ultimately exhausted all afforded peremptory challenges, the erroneous denial of a challenge of a prospective juror for cause is a structural error requiring automatic reversal."

---

[2] For the incest and SIWOC offenses against D.S., Counts I, II, IV, and V, the District Court sentenced Deveraux to four concurrent sentences of 100 years in prison, no time suspended, with a 25-year parole restriction. For the sexual assault offense against D.S., Count III, Deveraux was sentenced to 50 years in prison, no time suspended, to run concurrently with his other offenses against D.S. For the SIWOC offense against B.J., Count VI, the District Court sentenced Deveraux to 20 years in prison, no time suspended, to run consecutively to his sentences for the offenses against D.S.

*State v. Johnson*, 2019 MT 68, ¶ 7, 395 Mont. 169, 437 P.3d 147 (citing *State v. Good*, 2002 MT 59, ¶¶ 62-65, 309 Mont. 113, 43 P.3d 948).

¶20    This Court reviews jury instructions given by a district court for abuse of discretion. We review jury instructions to determine whether, taken as a whole, the instructions fully and fairly instruct the jury as to the applicable law. *State v. Secrease*, 2021 MT 212, ¶ 9, 405 Mont. 229, 493 P.3d 335 (citing *State v. King*, 2016 MT 323, ¶ 7, 385 Mont. 483, 385 P.3d 561). "If the instructions are erroneous in some aspect, the mistake must prejudicially affect the defendant's substantial rights in order to constitute reversible error." *State v. Gerstner*, 2009 MT 303, ¶ 15, 353 Mont. 86, 219 P.3d 866 (citation omitted).

¶21    We generally do not review issues raised for the first time on appeal, but when a defendant asserts an error implicating a fundamental right, "we may choose to invoke the common law plain error doctrine where failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *State v. Favel*, 2015 MT 336, ¶ 13, 381 Mont. 472, 362 P.3d 1126 (citing *State v. Taylor*, 2010 MT 94, ¶ 12, 356 Mont. 167, 231 P.3d 79).

**DISCUSSION**

¶22    *1. Was the District Court's denial of Deveraux's motion to remove a prospective juror for cause a structural error requiring reversal of Deveraux's convictions and a new trial?*

¶23    Deveraux argues the District Court abused its discretion in denying his challenge to juror R.G. because "the totality of [R.G.'s] responses raised serious questions about his

11

ability to serve fairly and impartially," and he contends the State improperly attempted to rehabilitate R.G. *See Morales*, ¶ 12 (citing *Johnson*, ¶ 12) (it is improper "for counsel or the court to attempt to rehabilitate the juror by asking leading or loaded questions eliciting a one-syllable answer, such as whether the juror will follow the law, jury instructions, or an order of the court"). The State answers that the District Court acted within its discretion because R.G. "separated his disdain for the crime of rape from his duty to serve impartially as a juror, [and] he unequivocally stated that he would fulfill his oath as a juror to base his verdict on the facts presented at trial and the law the district court provided."

¶24 Criminal defendants have a fundamental right under both state and federal constitutions to be tried by an impartial jury. U.S. Const. amend. VI; Mont. Const. art. II, § 24; *Anderson*, ¶ 14. "A defendant may accordingly challenge a prospective juror for cause if the juror manifests 'a state of mind' regarding the case or either party 'that would prevent the juror from acting with entire impartiality' regarding the parties and material matters in the case." *Johnson*, ¶ 9 (quoting § 46-16-115(2)(j), MCA).

¶25 Deveraux frames the issue as structural error requiring automatic reversal. "A structural error is typically of constitutional dimensions, precedes the trial, and undermines the fairness of the entire trial proceeding . . . . structural error is automatically reversible and requires no additional analysis or review." *Good*, ¶ 59 (citing *State v. Van Kirk*, 2001 MT 184, ¶¶ 38-39, 306 Mont. 215, 32 P.3d 735). Errors involving jury selection are structural because they precede the trial and affect the fundamental, constitutional right to an impartial jury. *Good*, ¶ 60. We held in *Good* that, in the context of jury selection,

12

"structural error occurs if: (1) a district court abuses its discretion by denying a challenge for cause to a prospective juror; (2) the defendant uses one of his or her peremptory challenges to remove the disputed juror; and (3) the defendant exhausts all of his or her peremptory challenges." *Good*, ¶ 62.

¶26   As noted, Deveraux did not use a peremptory challenge to remove R.G. from the jury pool, and thus he cannot satisfy part two of the analysis. Alternatively, Deveraux argues that, even if he cannot meet the requirements for structural error, our holding in *Good* "does not foreclose a new trial when a biased juror, nevertheless, is seated on the jury," citing two cases for support. In *Anderson*, an already-selected juror told the bailiff he was "pretty sure the Defendant is guilty" based upon the questioning that had occurred during voir dire. *Anderson*, ¶ 5. We acknowledged the "unusual scenario" but nonetheless concluded it was appropriately considered structural error requiring reversal because, based upon the juror's statement to the bailiff and his following answers to the court, the district court abused its discretion by not removing the juror for cause at that juncture. *Anderson*, ¶¶ 19-21. The "unusual scenario" we faced in *Anderson* is not present here, as R.G.'s views were revealed in the ordinary course of voir dire, before peremptory challenges were exercised. Unlike in *Anderson*, Deveraux's counsel had the chance to question R.G. about his potential bias before he was selected for the jury, and to use a peremptory to strike R.G., but instead chose to exhaust them on other prospective jurors.

¶27   Deveraux also cites *State v. Chastain*, 285 Mont. 61, 947 P.2d 57 (1997). There, Chastain's counsel failed to make additional inquiries of two prospective jurors who

13

expressed potential bias, failed to challenge either prospective juror for cause, and failed to remove them with a peremptory. *Chastain*, 285 Mont. at 63-64, 946 P.2d at 59. We held counsel had rendered ineffective assistance, and we reversed and remanded for a new trial. *Chastain*, 285 Mont. at 65-66, 946 P.2d at 60. Here, rather than an ineffectiveness claim, we are faced with the exercise of the District Court's discretion following defense counsel's additional inquiry of R.G. and his challenge for cause. Further, *Chastain* was decided five years before we articulated the three-part test for structural error in *Good*, and we have thereafter continued to rely on it. *See Morales*, ¶ 7; *Johnson*, ¶¶ 7, 16; *State v. Allen*, 2010 MT 214, ¶ 20, 357 Mont. 495, 241 P.3d 1045.[3]

¶28 Deveraux justifies not exercising a peremptory to remove R.G. by explaining he "was compelled to use peremptory challenges on other less desirable individuals." He provides reasoning for only four of the six individuals he removed, and, therefore, there is no demonstration that Deveraux could not have elected to remove R.G., as was defense counsel's predicament in *Anderson*. We conclude Deveraux has not satisfied the structural error standard required by *Good* that would entitle him to reversal. *Good*, ¶ 62.

¶29 *2. Did the District Court err by giving a conduct-based jury instruction defining mental state for the SIWOC offense against B.J., rather than a results-based definition?*

¶30 SIWOC is statutorily defined as: "A person who knowingly has sexual intercourse with another person without consent." Section 45-5-503(1), MCA. "When a criminal

---

[3] We later overruled "*Chastain's* holding that a claim of ineffective assistance of counsel for failure to challenge prospective jurors in voir dire can be determined from a record which is silent as to the lawyer's reasoning." *State v. Herrman*, 2003 MT 149, ¶ 33, 316 Mont. 198, 70 P.3d 738.

offense requires that a defendant act 'knowingly,' the [d]istrict [c]ourt must instruct the jury on what the term 'knowingly' means in the context of the particular crime." *State v. Azure*, 2005 MT 328, ¶ 20, 329 Mont. 536, 125 P.3d 1116. Section 45-2-101(35), MCA, provides several definitions of "knowingly." Two are at issue here—the conduct-based definition given to the jury, and the result-based definition proposed by Deveraux at trial, but rejected by the District Court. Deveraux argues the conduct-based instruction, which required the jury to find only that Deveraux was aware of his own conduct, "eliminated a necessary element of the offense of [SIWOC]: the specific intent to commit the underlying crime charged." He argues the District Court should have used a result-based instruction so the jury would have been required to find he acted with an awareness there existed a high probability that his conduct would cause the specific result of the offense. Section 45-2-101(35), MCA. Deveraux asserts this alleged error lowered the State's burden of proof, thereby violating his constitutional right to due process and his fundamental right to a fair trial. *See State v. Clark*, 1998 MT 221, ¶ 29, 290 Mont. 479, 964 P.2d 766 (citations omitted) ("The due process guarantee of the Montana Constitution, embodied in Article II, Section 17, makes it the State's duty in a criminal prosecution to prove beyond a reasonable doubt every element of the crime charged."); *see also Secrease*, ¶ 15.

¶31 Whether an offense is a conduct-based offense or a result-based offense is determined by an analysis of its elements. For example, regarding the offense of obstructing a peace officer, § 45-7-302, MCA, we have held that a result-based mental state instruction is required because "[f]or a person to knowingly obstruct an officer's lawful

15

duty, the defendant must be aware that her conduct is highly probable to hinder the performance of that duty." *State v. Bennett*, 2022 MT 73, ¶ 10, 408 Mont. 209, 507 P.3d 1154 (citing *City of Kalispell v. Cameron*, 2002 MT 78, ¶ 11, 309 Mont. 248, 46 P.3d 46); *see also State v. Johnston*, 2010 MT 152, ¶ 14, 357 Mont. 46, 237 P.3d 70; *Secrease*, ¶ 15. In *Johnston*, we held that, for a conviction of obstruction for lying to officers, the State needed to prove, and the jury needed to find, both that the defendant was aware he gave dishonest answers to the officers (his "conduct"), and that he was aware it was highly probable his dishonest answers would hinder the officers' duties (the "result" of his conduct). *Johnston*, ¶¶ 12, 14. In other words, lying to officers alone is not the defined illegal conduct; the crime also includes the defendant's awareness of the high probability his lying would result in hindering the officers' duties. Similarly, we held that the offense of criminal endangerment, § 45-5-207, MCA, requires a result-based instruction because, there is "no particularized conduct which gives rise to criminal endangerment . . . . It is the appreciation of the probable risks to others posed by one's conduct that creates culpability for criminal endangerment." Therefore, requiring the defendant only be aware of his conduct is incorrect. Rather, a person may "engage in a wide variety of conduct and still commit the offense of criminal endangerment, provided the conduct creates a substantial risk of death or serious bodily harm. It is the avoidance of this singular result, the risk of death or serious harm, that the law attempts to maintain." *State v. Lambert*, 280 Mont. 231, 236, 929 P.2d 846, 849 (1996).

16

¶32 Deveraux argues, without citation to specific authority, that SIWOC is a result-based offense. Deveraux contends that, because the statute does not criminalize the act of sexual intercourse, the conduct-based instruction incorrectly required the jury to find only that he was aware he was engaging in that legal act with his then-wife, B.J. We disagree. For SIWOC, the prohibited particularized conduct itself—engaging in sexual intercourse with another person *without that person's consent*—gives rise to the entire criminal offense, and requires only a conduct-based instruction. *See Gerstner*, ¶ 29. Legal sexual intercourse is distinct *conduct* from SIWOC. The statutory definition of SIWOC introduces both elements, "sexual intercourse" and "without consent," with the word "knowingly," and applies to both. "[C]ourts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element." *Flores-Figueroa v. United States*, 556 U.S. 646, 652, 129 S. Ct. 1886, 1891 (2009). In contrast to our cases cited above, there is no "wide variety of conduct" that may become SIWOC depending on the result of that conduct. The SIWOC statute clearly seeks to prohibit the conduct of rape, not any additional "singular result." *Lambert*, 280 Mont. at 236, 929 P.2d at 849. Here, "knowingly" was listed on the jury instruction as the final element in SIWOC, modifying the previous elements, including B.J.'s lack of consent. This mental state element clearly applied to Deveraux's knowledge of B.J.'s lack of consent. Based on the jury instructions, the jury could not have convicted Deveraux for legal sexual intercourse with B.J.

17

¶33 The State notes other cases in which this Court has approved conduct-based "knowingly" instructions for sexual offenses. *See Gerstner*, ¶ 29 (sexual assault); *State v. Harrington*, 2017 MT 273, ¶ 16, 389 Mont. 236, 405 P.3d 1248 (citation omitted) (sexual abuse of children). The District Court did not err by instructing the jury on this charge.[4]

¶34 *3. Should this Court exercise plain error review of an incorrect jury instruction on the definition of consent offered by Deveraux?*

¶35 Deveraux also asks the Court to exercise plain error review and reverse his conviction for the SIWOC offense against B.J., on the ground the District Court incorrectly instructed the jury with the inapplicable 2017 definition of consent, a definition that did not exist at the time of the alleged offense. The applicable definition of consent would have required the State to show Deveraux used force to compel B.J. to submit to sexual intercourse, and he asserts the erroneous instruction violated his due process rights by relieving the State's burden to prove the element of consent as it then existed in the law.

¶36 "It is well established that in criminal cases, the law in effect at the time of an alleged offense applies in any subsequent prosecution." *City of Missoula v. Zerbst*, 2020 MT 108, ¶ 12, 400 Mont. 46, 462 P.3d 1219 (citing *State v. Daniels*, 2003 MT 30, ¶ 17, 314 Mont. 208, 64 P.3d 1045). "[A] change in the definition of an offense does not affect acts

---

[4] Deveraux argues the conduct-based instruction harmed his defense because at trial "[h]e admitted to having sex with [B.J.], but not during the times she described, and never without her consent." Deveraux testified he was not aware that, while having sex with B.J., she did not consent. This defense theory is consistent with, and unimpacted by, the given conduct-based instruction. The State offered evidence showing Deveraux was in fact aware that B.J. did not consent, primarily through B.J.'s testimony she told Deveraux to stop, told him she was in pain, and attempted to fight back. The jury then made a factual determination based on the conflicting evidence.

18

committed prior to the effective date." *Daniels*, ¶ 17. Deveraux is guaranteed due process of law under the Fourteenth Amendment of the United States Constitution and Article II, Section 17, of the Montana Constitution, which requires the State prove every element of the charged offense beyond a reasonable doubt. *Zerbst*, ¶ 30 (citing *State v. Carnes*, 2015 MT 101, ¶ 11, 378 Mont. 482, 346 P.3d 1120).

¶37     Here, the District Court indeed instructed the jury with an incorrect definition of consent, and should have given the State's proposed instruction, which was consistent with the statutory definition in effect when Deveraux was alleged to have committed the offense.[5] "Without consent" then meant "the victim is compelled to submit by force against the victim or another," § 45-5-501(1)(a)(i), MCA (2013), and "force" was defined as "the infliction, attempted infliction, or threatened infliction of bodily injury." Section 45-5-501(2)(a), MCA (2013). A proper instruction would have required the State to prove force, and this failure implicated Deveraux's fundamental rights to due process and to a fair trial. *See State v. Akers*, 2017 MT 311, ¶ 16, 389 Mont. 531, 408 P.3d 142; *Carnes*, ¶ 13.

¶38     "Failure to contemporaneously object to an asserted error generally constitutes a waiver of the right to seek appellate review." However, we may review an unpreserved assertion of error under the narrow exception of plain error review upon satisfaction of the

---

[5] Deveraux was charged with SIWOC against B.J. for actions occurring between 2011 and 2014. The statutory definition of "consent" did not change during this time, and we reference the 2013 version of the statute that Deveraux cites to in his briefing.

applicable standards. *State v. Miller*, 2022 MT 92, ¶ 10, 408 Mont. 316, ___ P.3d ___. To qualify for plain error review, Deveraux must 1) demonstrate that the asserted error implicates a fundamental right; and 2) firmly convince this Court that a failure to review the asserted error would "result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process." *Akers*, ¶ 10 (citing *Favel*, ¶ 23).

¶39 Deveraux cites *State v. Resh*, 2019 MT 220, 397 Mont. 254, 448 P.3d 1100, and *Zerbst* to support his argument. In both cases, the trial court instructed the jury with an incorrect definition of consent that allowed the jury to rely exclusively on inapplicable statutory categories to find lack of consent. *Zerbst*, ¶¶ 6, 24 (erroneous instruction permitted the jury to find the alleged victim was incapable of consent because she was "mentally disordered or incapacitated," a statutory category that did not exist when the alleged offense occurred); *Resh*, ¶¶ 12, 20 (an instruction providing the incorrect age of consent permitted the jury to incorrectly find incapability of consent based solely on the alleged victim's age). Thus, the incorrect instructions in these cases removed the State's burden to properly prove lack of consent, excusing the jury from "looking at the evidence as a whole," evaluating the credibility of witnesses, and resolving factual disputes regarding consent. *Resh*, ¶ 20; *Zerbst*, ¶¶ 24, 37.

¶40 This case is distinct from *Resh* and *Zerbst* because the evidence and arguments presented at trial, despite the incorrect instruction, nonetheless required the jury to resolve the requisite factual issue of whether Deveraux had used force. The State's theory was that

20

Deveraux used force to commit SIWOC against B.J., and its evidence supported this theory. According to B.J.'s testimony, Deveraux used "the infliction, attempted infliction, or threatened infliction of bodily injury" to compel her to submit to sexual intercourse. Section 45-5-501(2)(a), MCA (2013). She testified to numerous instances of forceful, violent intercourse against her will. These attacks caused bodily injury and pain, exacerbating her significant injuries from the accident. B.J.'s son testified that he heard his mother scream on multiple occasions and tell Deveraux to "stop," that "it hurts," and that she did not like what he was doing to her. Kathy corroborated that B.J. was bleeding days after the anal trauma. Deveraux responded by denying any forceful actions and instead offered a version of events where the couple engaged in consensual sexual activity while being careful to accommodate B.J.'s injuries. Counsel questioned Deveraux directly about using force, B.J. telling him she was in pain, and using sex as a punishment. He asserted B.J. was lying. Consequently, despite the incorrect instruction, the jury could not avoid considering the trial's substantial evidentiary conflict and evaluating witness credibility to resolve the central factual dispute of whether Deveraux had used force to submit B.J. to sexual intercourse without her consent. Therefore, the issue of Deveraux's use of force was central to his conviction, and the jury necessarily and correctly considered force as the basis for finding B.J.'s lack of consent. Section 45-5-501(1)(a)(i), MCA (2013).

¶41    Plain error review is discretionary, and we apply it sparingly on a case-by-case basis "considering the totality of circumstances of each case." *Akers*, ¶ 13 (citation and quotation

omitted); *Favel*, ¶ 13 (citation omitted). Here, the totality of circumstances does not meet the standard for us to exercise plain error review. While Deveraux's asserted error implicates fundamental rights, the jury still considered the right issue in spite of the wrong instruction, and we are not firmly convinced that our failure to review this error would "result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process." *Akers*, ¶ 10.

¶42    Likewise, we are not persuaded by Deveraux's argument that his attorney's error in proposing the incorrect consent instruction amounted to ineffective assistance of counsel. Based on the volume and centrality of the evidence regarding force presented at trial, Deveraux cannot demonstrate that "there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Resh*, ¶ 18 (quoting *State v. Kougl*, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095).

¶43    Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR

22